917 P.2d 250

**Laurence FLOREZ, Petitioner,**

v.

**Honorable William P. SARGEANT, III, a Judge for the Superior Court of the State of Arizona, County of Maricopa, Respondent Judge,**

and

**Ramon GOMEZ, Real Party in Interest.**

**Clarence Russell DUNCAN and Mary Justice Duncan, individually and as husband and wife, Petitioners,**

v.

**Hon. Alan S. KAMIN, a Judge, Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Judge,**

**Melissa MOONSHADOW, Real Party in Interest.**

Nos. CV–94–0454–PR, CV–94–0495–PR.

Supreme Court of Arizona, En Banc.

May 16, 1996.

Jennings, Strouss & Salmon by Ernest Calderon, William F. Auther, Gordon Lewis, Phoenix, for Laurence Florez.

Treon, Strick, Lucia & Aguirre by Richard T. Treon, Arthur G. Newman, Jr., Phoenix, for Ramon Gomez.

Ridenour, Swenson, Cleere & Evans by James W. Evans, Phoenix, for Clarence Russell Duncan and Mary Justice Duncan.

Cohen, McGovern, Shorall & Stevens by Larry J. Cohen, Penny Taylor Moore, Phoenix, for Melissa Moonshadow.

OPINION

MARTONE, Justice.

These are tort actions consolidated for argument and opinion in which the only issue is whether they are barred by the statute of limitations. We conclude that they are.

I. Florez

Gomez, now 30 years old, claims that 18 years ago when he was about 12, Florez, then a priest, molested him. This was between 1978 and 1980. Gomez then led a nomadic life as a stripper and prostitute. Twelve years later, in 1990, he claims to have remembered these incidents and reported the abuse to a priest in late 1990, who then informed the Diocese of Phoenix. Gomez Affidavit at 4. On December 21, 1990, Gomez was interviewed by Diocesan lawyer, Ernest Calderon. Gomez said that his own

lawyer, Kenneth Buford, consented to the interview without his presence. At that interview, Gomez said:

A lot of people ask you this one question. It may be floating through your mind as well. You ask me why did you take so long to come up and say something else. Well I'll tell you this. I couldn't deal with it. I didn't have no one to turn to. I wasn't ready to come up and talk about it, *now I am. Now I'm able to deal with it.*

Transcript of Gomez interview at 11 (emphasis added).

On May 17, 1991, Calderon wrote to Gomez and his lawyer, Kenneth Buford, indicating that after investigation, the Diocese had concluded that Gomez's claim was without merit. He also informed Gomez of the two year statute of limitations under A.R.S. § 12–542 and that it was the position of the Diocese that the statute had run. On June 27, 1991, Gomez's new lawyer, Craig Zirbel, wrote Calderon that his office was investigating the matter and reviewing the statute of limitations issue. Mr. Zirbel indicated that Gomez had also retained a Minnesota lawyer, Jeff Anderson, who specialized in sexual abuse cases against priests.

Gomez filed an action against Florez on June 30, 1993. Gomez moved for summary judgment on the statute of limitations defense arguing that it was tolled because (1) he was of unsound mind within the meaning of A.R.S. § 12–502, (2) he was under duress, (3) his memory was repressed, and (4) he did not connect the sexual abuse to his injuries until within two years of filing the action. Florez filed a cross-motion for summary judgment on the statute of limitations defense. Concluding that there was an issue of fact, the trial judge denied both motions. Florez filed a petition for special action, but the court of appeals declined jurisdiction. Believing that this was one of those rare cases that justified extraordinary relief, we granted Florez's petition for review.

In support of his motion for summary judgment, Gomez submitted the affidavits of two experts indicating that he suffered from post-traumatic stress disorder, depression,

sexual identity problems, and other problems indicating an unsound mind.

## II. Duncan

Melissa Moonshadow was born in 1955. She alleges that her father abused her from the age of 6 until the age of 17. The abuse alleged is of the most perverse and criminal sort. Among other things, she claims that he raped her, kicked her, mutilated her, and even penetrated her with various physical objects. She claims that he threatened her with injury or death, if she told of the abuse. The last time her father physically abused her was in June of 1989.

On July 16, 1993, Moonshadow filed this action. Duncan, Moonshadow's father, moved for summary judgment arguing that the action was barred by the two year statute of limitations under A.R.S. § 12–542. Moonshadow responded with an affidavit from her counsellor that she suffered from post-traumatic stress disorder, which prevented her from confronting her father through litigation. The counsellor, however, admitted at her deposition that Moonshadow was always capable of managing her own personal affairs from the time she reached her majority, was fully aware of the fact that her father sexually assaulted her as a child, and discussed with her in October of 1989 the possibility of joining her sister in a civil action against her father. The trial court granted Duncan's motion for summary judgment, but then granted Moonshadow's motion to reconsider, not because he found evidence of unsound mind, but because he thought the doctrine of equitable estoppel would prevent the use of the statute of limitations as a defense under these circumstances. Duncan then filed a petition for special action in the court of appeals, which declined jurisdiction. Believing that this case ought to be considered with the *Florez* case, we granted review.

## III. Analysis

■ We acknowledge that special action relief from the denial of summary judgment is almost always inappropriate. But we also acknowledge that in the rare extraordinary case, special action relief may be the only way to avoid the very harms a particular

defense was intended to prevent. Because this is one of those cases, we granted review.

It is undisputed on this record that, unless tolled, the statutes of limitations have expired. Gomez's injuries occurred when he was under 18. The two year statute of limitations under § 12–542 was tolled during his minority under § 12–502(A) until he turned 18 in 1983. Thus, unless further tolled for some reason, the statute of limitations expired in 1985, some 8 years before he filed his action. Similarly, the bulk of Moonshadow's claim relates to events that occurred before she was eighteen. The two year statute was tolled until 1973, and those claims would have expired in 1975. She brought her action in 1993, 18 years later. Some of her claims relate to matters alleged to have occurred as late as 1989, but this is still more than two years before she filed her action. Thus, like Gomez, unless there is some doctrine under which tolling occurred, her claims are barred.

■ Both Gomez and Moonshadow argue that their psychological disorders, particularly post-traumatic stress disorder, operated to prevent them from bringing their actions in time. The legislature has specifically addressed the role of the mind on the tolling of the statute of limitations. A.R.S. § 12–502(A) provides as follows:

> if a person entitled to bring an action ... is at the time the cause of action accrues ... of unsound mind, the period of such disability shall not be deemed a portion of the period limited for commencement of the action.

The section heading refers to unsound mind as "insanity." Although section headings are not law, A.R.S. § 1–212, they can help to resolve ambiguities. *Garrison v. Luke*, 52 Ariz. 50, 56, 78 P.2d 1120, 1123 (1938); *Arizona Found. for Neurology & Psych. v. Sienerth*, 13 Ariz.App. 472, 475, 477 P.2d 758, 761 (1970); *see also Fleming v. Black Warrior Copper Co.*, 15 Ariz. 1, 8, 136 P. 273, 275 (1913) (demurrer to complaint alleging "Knox was insane" overruled because that was an allegation of unsound mind). While we have never expressly addressed the definition of "unsound mind" within the meaning of the

statute, our cases refer to it as insanity. *Western Coal and Min. Co. v. Hilvert,* 63 Ariz. 171, 183, 160 P.2d 331, 336 (1945). Indeed, this very term, we described the disability for "unsound mind" under § 12–502(A) as one for "incompetents" and "persons who are insane." *Vega v. Morris,* 184 Ariz. 461, 463–64, 910 P.2d 6, 8–9 (1996).

The court of appeals, however, has squarely addressed the question. *Allen v. Powell's Int'l, Inc.,* 21 Ariz.App. 269, 270, 518 P.2d 588, 589 (1974). In that case, a person injured in an automobile accident brought his claim more than two years after it accrued. The defendant moved for summary judgment. The plaintiff claimed that the statute tolled because he was of unsound mind as a result of the accident. He complained of depression and was concerned about his emotional condition. But he also went to graduate school, and resumed his work as a teacher. He continued to function as a teacher and carried out his regular day-to-day personal and business affairs, notwithstanding his concern about his emotional condition. The court of appeals affirmed the grant of summary judgment. It concluded that "a person of 'unsound mind,' as used in this setting, has been interpreted to mean that such a person is unable to manage his affairs or to understand his legal rights or liabilities." *Id.* at 270, 518 P.2d at 589. Division Two followed the *Allen* case in *Nelson v. Nelson,* 137 Ariz. 213, 215–16, 669 P.2d 990, 992–93 (App.1983). Indeed, Division Two understood this to be "incompetency." *Id.*

We agree with both divisions of our court of appeals. The focus of the unsound mind inquiry is on a plaintiff's ability to manage his or her ordinary daily affairs. It does not focus on the plaintiff's ability to pursue the subject matter of the litigation at issue. This is consistent with cases elsewhere. *See, e.g., Doe v. Coffee County Bd. of Educ.,* 852 S.W.2d 899 (Tenn.Ct.App.1992); *Hildebrand v. Hildebrand,* 736 F.Supp. 1512 (S.D.Ind. 1990); *O'Neal v. Division of Family Services,* 821 P.2d 1139 (Utah 1991).

Neither Gomez nor Moonshadow claimed to be insane or incompetent. Instead, they argue that their post-traumatic stress disorder is sufficient to toll the statute of limitations.

Post-traumatic stress disorder is characterized by the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) (DSM IV) as an anxiety disorder where the victim reexperiences "an extremely traumatic event accompanied by symptoms of increased arousal and avoidance of stimuli associated with the trauma." DSM IV at 393. The traumatic event must involve "actual or threatened death or serious injury, or a threat to the physical integrity of self or others," and the person must experience "intense fear, helplessness, or horror." *Id.* at 427–28. Post-traumatic stress disorder symptoms are experienced in varying degrees and for varying lengths of time by different people. Arguably, the impairment caused by post-traumatic stress disorder could be severe enough so that a person could not carry out his or her normal day-to-day activities. But simply attaching the post-traumatic stress disorder label to a person's symptoms is insufficient to satisfy the *Allen* definition of unsound mind.

States vary widely in their approach to the effect of post-traumatic stress disorder on the tolling of statutes of limitations. In nonsexual abuse cases, it is generally found to be insufficient. *See McCarthy v. Volkswagen of America, Inc.,* 55 N.Y.2d 543, 450 N.Y.S.2d 457, 435 N.E.2d 1072 (1982) (car accident); *In re Kindle,* 509 N.W.2d 278 (S.D.1993) (action against public entity for failing to protect her from an estranged husband); *In re Lattanzi,* 61 Ohio Misc.2d 546, 580 N.E.2d 541 (Ohio Ct. of Cl.1990) (untimely filed reparations application). Many states have concluded that post-traumatic stress disorder is not incompetency for purposes of their statutes of limitations. *See, e.g., Doe v. Coffee County Bd. of Educ.,* 852 S.W.2d 899, 905 (Tenn.Ct.App.1992) (post-traumatic stress disorder did not constitute "unsound mind" which is the incapability of attending to any business or taking care of oneself); *Doe v. R.D.,* 308 S.C. 139, 417 S.E.2d 541, 543 (1992) (plaintiff knew of sexual assault but did not realize the extent of his injuries until diagnosed with post-traumatic stress disorder).

To our knowledge, no state has found that a diagnosis of post-traumatic stress disorder alone, is sufficient to constitute insanity or unsound mind within the meaning of the relevant statute. Some states have, however, found that the disabling effects of child sexual abuse may constitute incompetency sufficient to toll the statute. *See Jones v. Jones,* 242 N.J.Super. 195, 576 A.2d 316 (App.Div. 1990); *Nicolette v. Carey,* 751 F.Supp. 695 (W.D.Mich.1990); *Petersen v. Bruen,* 106 Nev. 271, 792 P.2d 18 (1990).

Child sexual abuse cases present very difficult problems because of the competing interests at stake. The acts alleged are awful. They would arouse the righteous indignation of any sensible person. On the other hand, statutes of limitations are designed to encourage plaintiffs to pursue claims diligently and to prevent the assertion of stale and fraudulent claims. We believe that the *Allen* test of unsound mind strikes the appropriate balance. If there is hard evidence that a person is simply incapable of carrying on the day-to-day affairs of human existence, then the statute is tolled. Otherwise it is not. These are empirical facts easily verifiable and more difficult to fabricate than a narrow claim of inability to bring the action. *See Lemmerman v. Fealk,* 449 Mich. 56, 534 N.W.2d 695, 703 (1995) (quoting Report of the Council on Scientific Affairs, American Medical Association, *Memories of Childhood Abuse,* CSA Report 5–A–94, recommending a policy statement that the AMA considers recovery of memories of childhood sexual abuse to "produce results of uncertain authenticity").

■ We therefore apply the *Allen* test for unsound mind to each of these two cases. Gomez has led an unconventional life style. But he has been able to work, maintain a bank account, and take care of himself. He reported the abuse to a priest in late 1990, consulted with a lawyer, and admitted on December 21, 1990, that he was ready to talk about it and was "able to deal with it." In June of 1991, more than two years before he filed his action, he had a new lawyer who was investigating his claim as well as the applicable statute of limitations. It is thus absolutely undisputed that more than two years be-

fore he filed his civil complaint, Gomez was not of "unsound mind."

■ Moonshadow worked at Arizona State University full time and was considered very competent at her job. She also went to school part-time. Her therapist admitted that she could function on a day-to-day basis, could support herself and that she understood the nature of her legal rights. Her therapist acknowledged that in October 1989, Moonshadow discussed joining her sister in an action against their father. In November 1989, she discussed the action further, stating that her sister could not find a lawyer. In June of 1991, Moonshadow told her therapist that she planned to file a civil action. Moonshadow's testimony about her father's abuse is extraordinary, but none of it related to her ability to function on a daily basis and carry out her normal activities. No evidence suggested Moonshadow was of "unsound mind" within the meaning of *Allen.*

### IV. Expert Affidavits on Summary Judgment

■ The dissent believes that the affidavits of Gomez' and Moonshadow's treating psychologists are sufficient evidence of "unsound mind" to create a jury issue. But affidavits that only set forth ultimate facts or conclusions of law can neither support nor defeat a motion for summary judgment. *Galindo v. Precision American Corp.,* 754 F.2d 1212, 1216 (5th Cir.1985) 10A (citing Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 2738 (1983); *see Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990) ("The object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). An expert affidavit opposing a motion for summary judgment must set forth "specific facts" to support an opinion. Rule 56(e), Ariz.R.Civ.P. (adverse party's affidavit "must set forth specific facts showing that there is a genuine issue for trial"); *Jones v. Merchants Nat'l Bank & Trust Co.,* 42 F.3d 1054, 1057 (7th Cir.1994) ("Self-serving assertions without factual support in the record will not defeat a motion for summary judg-

ment."); *Jackson v. Anchor Packing Co.*, 994 F.2d 1295, 1304 (8th Cir.1993) ("Conclusory affidavits, even from expert witnesses, do not provide a basis upon which to deny a motion for summary judgment."); *United States v. Various Slot Machines on Guam*, 658 F.2d 697, 700 (9th Cir.1981) ("in the context of a motion for summary judgment, an expert must back up his opinion with specific facts").

There is more to admissibility than Rule 704, Ariz.R.Evid. The affidavits here are not objectionable because they embrace an ultimate issue, but because they are without relevant foundation. At trial, a party is entitled to the facts that support an opinion. Rule 705, Ariz.R.Evid. And the court is "expected to exercise its discretion so as to prevent the admission of such opinions if there is any serious question concerning the admissibility, under rule 703 or otherwise, of the underlying facts or data." Ariz.R.Evid. art. VII, Introductory Note: Problems of Opinion Testimony.

The same, of course, is true on summary judgment. Rule 56(e), Ariz.R.Civ.P., requires specific facts. The facts offered in support of the opinion evidence here are simply not relevant or material to the issue of unsound mind under the *Allen* test.

■ The opinions of plaintiffs' experts misconstrue the true meaning of "unsound mind." For example, Gomez submitted the affidavits of two psychologists, Francis Enos and Stuart Litvak. Enos's affidavit merely states that, in his professional opinion, Gomez has been of "unsound mind" within the meaning of *Allen* since the sexual abuse. Enos refers to no facts to support his opinion. He does attach his report, but it too fails to reveal any facts to support his opinion. The contrary is true. Enos's report documents that Gomez was able to manage his daily affairs. For example, he was able to save enough money on his own for a trip to Europe. Enos Psychological Report at 6; *see Orme School v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990) (affidavits that are internally inconsistent are insufficient to withstand a motion for summary judgment).

Doctor Litvak's affidavit is also insufficient. Litvak claims Gomez is of "unsound mind," but the facts he lists do not support such a legal conclusion. He says Gomez is of "unsound mind" because he dropped out of high school, has never been able to hold gainful employment for a substantial period of time, has never been able to maintain a place of residence for a substantial length of time, squanders his money, and suffers from depression and stress. Litvak Affidavit at 5–6. If these facts, and others listed in Litvak's affidavit, were sufficient to support a legal finding of "unsound mind," then all those who have less than satisfactory lives would be of "unsound mind."

■ Finally, we consider the affidavit submitted by Moonshadow's expert, Susan Lynne Morrow. She states that the symptoms of post-traumatic stress disorder made Moonshadow "dysfunctional and depressed, thereby making it very difficult to conduct her life 'normally'." Morrow Affidavit at 3. This is conclusory, and without value within the meaning of Rule 56(e), Ariz.R.Civ.P.

■ If we were to accept the affidavits submitted by plaintiffs' experts as sufficient to raise a triable issue of fact, then a motion for summary judgment would always be defeated by the use of an expert affidavit. The affidavits confuse the inability to bring an action with the inability to perform the basic functions of human existence. An inability to bring a lawsuit is no evidence of unsound mind. Under *Orme School*, a trial judge must evaluate the evidence in ruling on a motion for summary judgment and apply the same standard used for a directed verdict. 166 Ariz. at 309, 802 P.2d at 1008. Affidavits that contain inadmissible evidence, are internally inconsistent, or contradict the affiant's sworn testimony, and similar items of evidence, may create a scintilla or doubt, but "still be insufficient to withstand a motion for summary judgment." *Id.* That is what we have here.

V. Miscellaneous Arguments

In addition to the question of unsound mind, other tolling theories were raised in the trial court. Gomez urged the application of a delayed discovery rule, duress, fraud, and equity. Moonshadow argued equity.

The claims of duress and fraud are not sufficiently meritorious for discussion. Gomez relied upon *Ulibarri v. Gerstenberger,* 178 Ariz. 151, 871 P.2d 698 (App.1993) for his delayed discovery argument. And the trial judge in *Duncan* relied upon that same case to conclude there was room for equity here.

Ulibarri brought a tort action against her physician, which appeared time-barred on the face of the complaint. In response to a defense motion for summary judgment, the plaintiff claimed that the defendant had engaged in sexual conduct with her "while she was under hypnosis and that he had given her post-hypnotic suggestions that she would not remember his conduct." *Id.* at 156, 871 P.2d at 703. The trial court granted summary judgment, but the court of appeals reversed. Drawing on cases from other states, and merging such doctrines as equity,[1] a "delayed discovery rule,"[2] and concealment,[3] it ultimately held "that when the plaintiff presents evidence that the defendant concealed a cause of action thereby preventing the plaintiff from timely filing the claim, and when the defendant admits the actions underlying the claim thereby reducing the risk of staleness, the question of whether there is wrongful concealment capable of tolling the statute of limitations cannot be resolved by summary judgment." *Id.* at 159, 871 P.2d at 706.

 *Ulibarri* appears to be based upon an unprecedented amalgamation of a variety of different theories. But even if it is correctly decided, it has no application here. *Ulibarri* was a case in which the defendant's hypnosis prevented the plaintiff from remembering the events within the statutory period. By their own admissions, Gomez and Moonshadow knew the identity and conduct of their tortfeasors. Thus, no such equitable or delayed discovery considerations apply here. Both Gomez and Moonshadow knew or

should have known of the events giving rise to their claims long before the statute expired. *See Pritzlaff v. Archdiocese of Milwaukee,* 194 Wis.2d 302, 533 N.W.2d 780, 785 (1995) (statute of limitations is not tolled by discovery rule where plaintiff knew of all of the elements of her underlying claim well before the limitations period had expired); *ABC v. Archdiocese of St. Paul,* 513 N.W.2d 482, 486 (Minn.Ct.App.1994) (statute of limitations is not tolled where victim is aware or should have known of the wrongful conduct and harm incurred); *Sanchez v. Archdiocese of San Antonio,* 873 S.W.2d 87, 91 (Tx.Ct. App.1994) (same).

Nor does *Henry v. Industrial Comm.,* 157 Ariz. 67, 754 P.2d 1342 (1988), help these plaintiffs. In that case, a policeman was traumatized on the job in 1960. But the relationship between his symptoms and post-traumatic stress disorder was not well developed and did not even appear in psychiatric literature until the 1980s. This court refused "to hold a claimant to the knowledge that his job has caused a serious medical condition based on post-traumatic stress syndrome when the condition was not diagnosable at the time he first sought treatment." *Id.* at 70, 754 P.2d at 1345. In short, the policeman could not have known within the statutory period that the traumatic event had caused his problems. In contrast, both Gomez and Moonshadow knew that their abusers were the cause of their problems. The effects of pedophilia, rape, and aggravated assault were well developed when they allegedly occurred in these cases. They were not symptoms of some, as yet, undiscovered disease.

## V. Conclusion

The legislature enacted statutes of limitations in order to protect against the nightmare of stale claims. It has squarely addressed the categories of disabilities that will toll the statute in A.R.S. § 12–502. It is not

---

1. The court said, "[t]o allow the defendant to have the advantage of the statute of limitations if his hypnosis of the plaintiff created a mental impairment which rendered her unable to timely assert a legal right would be inequitable." 178 Ariz. at 157, 871 P.2d at 704.

2. The court said, "[w]e conclude that the application of delayed discovery is sound when applied

to the present facts." 178 Ariz. at 158, 871 P.2d at 705.

3. The court said, "[t]he plaintiff has alleged that defendant improperly concealed her cause of action by hypnosis and post-hypnotic suggestion." 178 Ariz. at 158, 871 P.2d at 705.

for us to enlarge the category of unsound mind through interstitial judicial lawmaking. These are very delicate policy decisions that properly belong to the legislative branch of government. If the legislature wants to broaden the category of disability to toll the statute of limitations in cases such as these, it is, of course, free to do so. But the weighing, balancing, and policy making that go into such an enterprise are properly legislative, not judicial, tasks.

We therefore reverse the orders in these cases that denied defense motions for summary judgment, and remand these cases to the superior court for entry of judgment in favor of the defendants and against the plaintiffs on their claims for relief.

MOELLER, J., and ROBERT J. CORCORAN, J. (Retired), Concur.

FELDMAN, Chief Justice, dissenting.

I respectfully dissent from the court's opinion for three reasons:

1. These are not the "rare, extraordinary cases" in which this court's intervention by special action is justified but simply cases presenting routine legal issues in which such relief from this court "is almost always inappropriate." Opinion at 524, 917 P.2d at 253.

2. The opinion incorrectly characterizes both the facts presented in the cross-motions for summary judgment and the issues raised in this court.

1. The trial judge was more detailed in his remarks at argument on the motion:

 Isn't it a question of fact of whether the fact finder believes what those people said, and whether it was ongoing and continuing, and all of the other sorts of things on down the line? Or whether, indeed, as [defendants] pointed out, he was able to get a job, do some other things? And regardless of what the opinion might be, I mean, I really have ... the notion that this is an unresolved factual issue as to what the circumstance was at the time, whether he was legally insane at one moment, made a recovery so there's some kind of tolling in there, or the statute started here, because of discovery. *Just seems to me that the whole picture that I now have in front of me is fraught with factual issues....*

3. Beginning with an incorrect picture of the facts and issues, the court inevitably misapplies the law.

**A. Special action jurisdiction**

To begin with, it is important to appreciate the difference between the unusual—even extraordinary—facts in both of these cases, and the rather routine legal issues decided by the trial judges. In ruling on motions and cross-motions for summary judgment, each judge found genuine issues of material fact regarding application of the statute of limitations. We have long held that when the facts controlling the date of accrual of a cause of action are in dispute, the jury must determine whether the action is barred. *Pritchard v. State*, 163 Ariz. 427, 433, 788 P.2d 1178, 1184 (1990). The same rule applies, of course, to factual disputes over the application of a tolling statute. *Vega v. Morris*, 184 Ariz. 461, 464, 910 P.2d 6, 9 (1996); *Lasley v. Helms*, 179 Ariz. 589, 592, 880 P.2d 1135, 1138 (App.1994); *Ulibarri v. Gerstenberger*, 178 Ariz. 151, 871 P.2d 698 (App.1993).

Both judges were well aware of this rule. The *Gomez* order, in operative part, holds as follows:

 3) Denying plaintiff's and defendants' Motions for Summary Judgment on the Statute of Limitations issue. It is the opinion of the Court the issue is one of fact to be determined by the trier of fact. *See Jones v. Jones*, 242 N.J.Super. 195, 576 A.2d 316; *Ulibarri v. Gerstenberger*, [178 Ariz. 151, 871 P.2d 698].[1]

The *Moonshadow* order reached a similar conclusion.[2]

Reporter's Transcript, Apr. 15, 1994, at 14 (emphasis added).

2. The majority states that "the trial court granted Duncan's motion for summary judgment, but then granted Moonshadow's motion to reconsider, not because he found evidence of unsound mind, but because he thought the doctrine of equitable estoppel would prevent the use of the statute of limitations *as a defense under these circumstances.*" Op. at 524, 917 P.2d at 253.

Actually, the trial judge stated he "so ruled for the following reasons:" and listed 13 numbered paragraphs. In five of those paragraphs, the judge specifically refers to Moonshadow's alleged mental incapacity as a basis for denying summary judgment (paragraphs 4, 5, 6 (which contains subparagraphs a–c), 7, and 11). Clearly,

We have consistently declined special action jurisdiction in cases involving factual disputes. *State Compensation Fund v. Symington,* 174 Ariz. 188, 191, 848 P.2d 273, 276 (1993) (special action jurisdiction appropriate only when "the issue before us turns solely on legal issues rather than on controverted factual issues."). Only clear, significant issues of law that have statewide importance are appropriate subjects for special action jurisdiction. *Espinoza v. Martin,* 182 Ariz. 145, 146, 894 P.2d 688, 689 (1995); *Fairness & Accountability in Ins. Reform v. Greene,* 180 Ariz. 582, 586, 886 P.2d 1338, 1342 (1994); *Sanchez v. Coxon,* 175 Ariz. 93, 94, 854 P.2d 126, 127 (1993). We follow these rules as a matter of sound jurisprudential policy. Any other rule would not only usurp the jury's function but give appellate priority where none is appropriate.

The court's opinion purports to recognize these jurisprudential rules in the first paragraph of its analysis, but it fails to explain why these two cases involve anything more than resolution of disputed factual issues regarding disability tolling under A.R.S. § 12-502(A). Each trial judge reviewed the facts, correctly applied the law, and concluded the tolling issue was for the jury. What does the court find so rare and extraordinary about such a ruling? Op. at 524, 917 P.2d at 253. Obviously the court cannot mean that we will accept special action jurisdiction to resolve disputed facts and draw factual inferences in every case in which the date of accrual of an action or tolling of the statute of limitations is put in issue. Why, then, pick these cases to do exactly that and thus give them this court's consideration ahead of all other cases in the state?

At this stage of the proceedings, we must assume that the facts presented by the party opposing the motion are true. *Thompson v. Better-Bilt Aluminum Prod. Co.,* 171 Ariz. 550, 558, 832 P.2d 203, 211 (1992). Viewing the facts in that light, it is painfully obvious that the plaintiffs might well have been disabled by an unsound mind following the horrible abuse they described. There was no

valid reason to accept jurisdiction and have this court play juror to decide contested facts. In support of its unwise intervention, however, the opinion seriously mischaracterizes the facts and the issues they raise.

## B. The facts and factual issues

### 1. Gomez

The opinion contains a number of factual errors. It begins by stating that Gomez "claims to have remembered" the sexual abuse incidents for the first time in 1990. Op. at 524, 917 P.2d at 253. In fact, Gomez generally admits that he always recalled these incidents. Op. at 527, 917 P.2d at 256. This is not a case of recovered memory. Such cases raise issues of accrual, not tolling. *Cf. Ulibarri,* 178 Ariz. at 158, 871 P.2d at 705. The present case, rather, involves a tolling question raising the unsound mind disability of A.R.S. § 12-502. It presents a very simple issue: Is there evidence from which a jury could conclude that the abuse, remembered all too well, caused Gomez or Moonshadow to have an unsound mind?

The majority concedes that Gomez supported his opposition to Florez' motion for summary judgment with the "affidavits of two experts *indicating* that he suffered from post-traumatic stress disorder, depression, sexual identity problems, and other problems indicating an unsound mind." Op. at 524, 917 P.2d at 253 (emphasis added). The opinion puts it much too mildly. Gomez submitted affidavits of two highly qualified psychologists listing the diagnosed mental illnesses and problems mentioned in the opinion—and many more—and not merely indicating but explicitly stating the factual *conclusion* that Gomez was unable to manage his affairs or understand his legal rights or liabilities. *See* Affidavit of Francis Enos, Ph.D., at 2, ¶ 8, a copy of which is attached as Appendix A; Affidavit of Stuart Litvak, Ph.D., at 4–5, ¶ 8, a copy of which is attached as Appendix B.

the judge based his decision on *both* equitable tolling principles and the factual disputes surrounding Moonshadow's state of mind.

This, of course, fits the exact legal test laid down in *Allen v. Powell's Int'l, Inc.*, 21 Ariz. App. 269, 270, 518 P.2d 588, 589 (1974). An unsound mind under the disability statute exists when the plaintiff is unable to manage his affairs or understand his legal rights or liabilities. *Id.* If, as the majority purports to do, we adopt the test traditionally followed in Arizona in *Allen* and in *Nelson v. Nelson*, 137 Ariz. 213, 215–16, 669 P.2d 990, 992–93 (App.1983), one wonders just what record a plaintiff must present to raise a question of fact for trial on the tolling defense of unsound mind.

These plaintiffs did, indeed, present detailed facts to support the ultimate conclusion. The opinion neglects to describe those details, simply stating that the facts set forth are "not relevant or material to the issue of unsound mind under the *Allen* test." Op. at 527, 917 P.2d at 256. That conclusion incorrectly characterizes the record.

For instance, Gomez submitted an affidavit from Dr. Francis Enos, a clinical and consulting psychologist who had interviewed Gomez and his family, tested Gomez, and studied his social history. The expert not only stated that Gomez suffered from "post-traumatic stress disorder, depression, sexual identity and other problems," Op. at 524, 917 P.2d at 253, but also said much more. He believed these conditions were caused by sexual abuse. He stated that Gomez had "been unable to manage his affairs or understand his legal rights or liabilities" since the abuse occurred. In reports attached to his affidavit, Dr. Enos set forth the foundation and basis for his opinion. *See* Appendix A.

Dr. Stuart Litvak, also a psychologist, made a thorough evaluation of Gomez and his case. He diagnosed Gomez as suffering from "post-traumatic stress disorder, including major depression with recurrent severe and psychotic features." Doctor Litvak also concluded that since and as a result of the sexual abuse, Gomez had been "unable to manage [his] affairs or to understand [his] legal rights or liabilities" and was of "unsound mind." Dr. Litvak's affidavit went on to list the evidentiary facts supporting his opinion. *See* Appendix B, paragraphs (a) through (x).

Defendants in *Gomez* offered nothing to contradict these affidavits. Ignoring the abundance of evidence provided by Gomez, the opinion attempts to draw and argue adverse factual inferences. It states that "it is thus absolutely undisputed that more than two years before [Gomez] filed his civil complaint, Gomez was not of 'unsound mind.'" Op. at 526–527, 917 P.2d at 255–256. However, even accepting the inferences the defendants and the majority draw, they do not establish the defendants' case as a matter of law.

The majority asserts, for example, that Gomez has been able to work. Op. at 526, 917 P.2d at 255. Gomez' work experience consisted almost exclusively of many short-term stints at fast food restaurants, although he also worked as an assistant to an x-ray technician and in physical therapy. Gomez' "highest" position, which the defendants refer to as "supervisory," was at a Burger King at age 25, where he was responsible for counting his cash drawer and opening the store in the morning. He worked at these jobs only sporadically, in intervals ranging from two months to one year at the longest, and had periods of time for up to a year with no employment. Gomez lived off and on with his parents or with friends, had over 100 residences, and for several years could afford neither his own residence nor any form of transportation. Gomez also "worked the streets," making money as a stripper and prostitute.

Thus, although Gomez has been able to work sporadically, this work experience does not establish a sound mind as a matter of law. Rather, it is *evidence* that could be introduced to establish Gomez' mental state, and that evidence in this case cuts both ways. A jury, not this court, should decide what the evidence proves. *See Davidson v. Baker–Vander Veen Constr. Co.*, 35 Mich.App. 293, 192 N.W.2d 312, 316 (1971) ("Although [plaintiff] was able to work regularly for various employers over a period of years and was able to perform sufficiently well to earn good wages, it does not inevitably follow that he is not insane.") Gomez' history does not even present a case of regular employment.

The majority also cites Gomez' statement that he was able to deal with the abuse as undisputed evidence that Gomez was not of unsound mind. Op. at 526, 917 P.2d at 255. This is both factually erroneous and legally incorrect. The statement was made during a taped interview in December 1990, when Gomez met for the first time with the lawyer for the Diocese and one of its priests. Gomez was not represented by counsel. During the interview, counsel for the Diocese asked Gomez if he had "thought about it (the abuse)," when it was happening; Gomez replied, "No, it was there. I had problems with it. I couldn't deal with it." Only later did Gomez clarify:

Alot of people ask [me] this one question. It may be floating through your mind as well. You asked me why did you take so long to come up and say something else. Well, I'll tell you this: I couldn't deal with it. I didn't have no one to turn to. I wasn't ready to come up and talk about it, now I am. Now I'm able to deal with it. Now my whole family knows about it. That was a big mistake. . . .

Interview at 11. Reading the statement in its entirety in the context of the interview, we cannot conclude, as the majority apparently does, that the statement is, *as a matter of law,* a concession by Gomez that he had regained the capacity to manage his affairs and understand his legal rights. Moreover, the statement was not taken under oath; nor is the "transcript" of the taped interview verified as being true and accurate. In fact, it was transcribed by a priest investigating the matter for the Diocese. The statement is evidence, but not conclusive evidence, of Gomez' state of mind. *See Davidson,* 192 N.W.2d at 316.

However, even if we were to entertain the majority's assertion that the selected portion of Gomez' statement constitutes an admission, the analysis is not over. Gomez presented an abundance of other evidence that would contradict this "admission," including affidavits and uncontroverted expert medical testimony amounting to a "direct and unequivocal denial . . . that he possessed the requisite mental capacity. . . . [Thus] a question of credibility remains." *Tri–Cities*

*Hospital Authority v. Sheats,* 156 Ga.App. 28, 273 S.E.2d 903 (1980), *aff'd,* 247 Ga. 713, 279 S.E.2d 210 (1981):

[H]ere the issue is evidentiary whether [plaintiff's] allegations of mental incompetency have been effectively pierced and summary judgment erroneously denied to appellants. While it is clear that at trial on the merits the burden would be on [plaintiff] to prove his mental incapacity, the burden here is on appellants, as movants for summary judgment, to demonstrate that no material issue of fact remains with reference to the tolling of the statute. Thus, the burden was on appellants to prove a negative that [plaintiff] was not mentally incompetent as alleged.

*Id.* 273 S.E.2d at 905 (citations omitted).

The majority also argues that because Gomez had spoken with an attorney about the abuse more than two years prior to filing suit, he could not be of unsound mind. Op. at 526, 917 P.2d at 255. Even if Gomez' meeting with an attorney was prompted by a desire to seek legal redress, other courts have confronted the exact issue and held:

We are not prepared to say that ability to retain a lawyer is conclusive evidence of mental competence for the purposes of this tolling provision . . . The fact that [plaintiff] retained counsel *is some evidence* that he was not mentally deranged, *but it does not conclusively establish that fact.*

*Davidson,* 35 Mich.App. 293, 192 N.W.2d 312, 315 (emphasis added); *see also Collins v. Dunifon,* 163 Ind.App. 201, 323 N.E.2d 264, 270 (1975); *Hill v. Clark Equipment Co.,* 42 Mich.App. 405, 202 N.W.2d 530 (1972).

This is a straightforward application of our Rule 56(c), Ariz.R.Civ.Pro., that disputed issues of material fact will foreclose a motion for summary judgment. Counsel for Florez can, and surely will, present evidence to the jury regarding Gomez' work, lifestyle, and legal experience. However, it is for the jury to determine if those facts preclude Gomez' tolling on the statute of limitations, not this court. On this record, when the majority draws the ultimate factual inference that "it is [ ] absolutely undisputed that more than two years before he filed his civil complaint, Gomez was not of 'unsound mind,' " Op. at

526–527, 917 P.2d at 255–256, it incorrectly characterizes the evidence, usurps the function of the jury and ignores the applicable law.

### 2. Moonshadow

Moonshadow submitted two affidavits from her treating mental health expert, Dr. Lynne Morrow, another well-qualified psychologist. In the first, Dr. Morrow stated as follows:

> The symptoms of PTSD which prevented her from confronting her father regarding the sexual abuse, and in particular confronting him through litigation, include persistent avoidance of stimuli associated with her trauma, efforts to avoid thoughts or feelings associated with the trauma, efforts to avoid activities or situations that arouse recollections of the trauma.

Morrow Affidavit at ¶ 7.

In the second affidavit, in support of other allegations contained in the complaint, Dr. Morrow repeated the above analysis and added:

> I believe that [by attempting confrontation through litigation] she would become increasingly dysfunctional and depressed, thereby making it very difficult for her to conduct her life "normally", to maintain or pursue employment and, most important, creating the real danger of possible suicide.

Supplemental Morrow Affidavit at ¶ 6.

Nonetheless, the majority concludes that "[t]here was *no* evidence to suggest Moonshadow was of 'unsound mind' within the meaning of *Allen.*" Op. at 527, 917 P.2d at 256 (emphasis added). The basis for this conclusion appears to be in the deposition of Dr. Morrow. (Moonshadow's therapist, the court says, "admitted that she could function on a day-to-day basis, could support herself, and that she understood the nature of her legal rights." Op. at 527, 917 P.2d at 256. Although statements to this effect may have been made in the deposition, in part in response to a question posed by defendants concerning Moonshadow's ability to handle a hypothetical car accident, Dr. Morrow's two affidavits indicate to the contrary. Thus, although Dr. Morrow may have made seemingly contradictory statements regarding Moonshadow's competence in different situations, "whether [the witness'] deposition testimony is entitled to be given more weight than the words of denial in [her] affidavit is not a question which can be answered on summary judgment." *Tri–Cities,* 273 S.E.2d at 906.

Moonshadow also submitted her own affidavit and one from her sister—both of which detailed the abuse and alleged that its effects rendered Moonshadow incapable of confronting her father through litigation. Moonshadow's response to the defendants' motion for summary judgment alleged that the *Allen* definition of unsound mind "surely applies to Plaintiff, who was literally incapable, emotionally, of taking even the most basic steps necessary to file a civil lawsuit." Clearly, Moonshadow has submitted enough evidence that she was unable to pursue her legal rights against her abusive father to defeat summary judgment on this issue. *See Modern Roofing & Metal Works, Inc. v. Owen,* 174 Ga.App. 875, 332 S.E.2d 14, 15–16 (1985) (plaintiff's "admittedly weak" allegation that he was "unable to manage the ordinary affairs of his life" due to *depression* resulting from the defendant's acts sufficient to invoke tolling provision) (emphasis added); *See also Lowe v. Pue,* 150 Ga.App. 234, 257 S.E.2d 209, 210, 212 (1979).

In reaching the conclusion that the plaintiffs failed to provide factual support for their contentions, the majority clearly ignores the detailed and voluminous reports attached to the affidavits—over thirty single-spaced pages of facts, test results, observations, clinical notes, history from various sources, and medical diagnoses. Thus, the court's statement that the affidavits "fail to reveal any facts" to support the doctors' opinions, Op. at 527, 917 P.2d at 256, is patently, plainly wrong. A cursory reading of some of the reports, which were attached to the affidavits, demonstrate just how incorrect is the court's premise. The reports referred to in the affidavits are replete with both factual conclusions and supporting evidentiary facts.

### C. Misapplication of law

Having first ignored the affidavits and decided the case as if they were not part of the

record, the majority finally acknowledges them, and then quickly dismisses them on two grounds. The first reason given is that, as "affidavits that only set forth ultimate facts or conclusions of law," they violate Rule 704 of the Arizona Rules of Evidence. Op. at 526, 917 P.2d at 255.[3] The second reason given is somewhat inconsistent with the first: the majority argues that in addition to opinion on the ultimate factual issues, the defendants "were entitled to the facts supporting" that opinion. Op. at 527, 917 P.2d at 256, citing Rule 705. Finding that no relevant supporting facts were given, the majority in effect strikes the affidavits. *Id.* Because of the majority's inconsistent approach to find some plausible explanation for disregarding the affidavits, we address each of its proffered justifications.

First, the opinion rejects the affidavits because they are "affidavits that only set forth ultimate facts or conclusions of law." Op. at 527, 917 P.2d at 256. This holding is legally wrong and ignores the Arizona Rules of Evidence, which state in relevant part:

> Testimony in the form of an opinion or inference otherwise admissible is *not objectionable* because it embraces an ultimate issue to be decided by the trier of fact.

Ariz.R.Evid. 704 (emphasis added); *see also State v. Lindsey*, 149 Ariz. 472, 475, 720 P.2d 73, 76 (1986) (same); *State v. Via*, 146 Ariz. 108, 123, 704 P.2d 238, 253 (1985) ("issues of ultimate fact may be the subject of expert testimony") (citations omitted); *State v. Williams*, 132 Ariz. 153, 160, 644 P.2d 889, 896 (1982) (expert testimony not improper even though the terms used were ultimate issues of the crime charged); *State v. Gentry*, 123 Ariz. 135, 137, 598 P.2d 113, 115 (App.1979) (expert may testify about conclusions drawn from his observations, even if the conclusion is an ultimate issue for the fact-finder.); Jack B. Weinstein and Margaret A. Berger, 2 WEINSTEIN'S EVIDENCE § 704[4] n. 3 (1995).

The majority's dismissal of the affidavits runs counter to every relevant case we have decided under our rules of evidence. For example, it is difficult to understand why an expert witness can properly testify to the ultimate issue that an intersection is "dangerous"—*see Dunham v. Pima County*, 161 Ariz. 304, 307, 778 P.2d 1200, 1203 (1989)— but cannot swear in opposition to a motion for summary judgment that a patient suffering from diagnosed mental and emotional trouble could not "manage his affairs." It is not possible to reconcile the court's ruling today with a holding that an officer could

---

**3.** The cases cited by the court for the proposition that mere conclusions of law cannot support or defeat a motion for summary judgment may be sound under the facts of those cases, but are quite inapplicable here.

*Galindo* only held that the *moving* party's affidavit in a strict liability product case was insufficient to shift the summary judgment burden to the non-movant because "the general statement that [the defendant] was not engaged in the business of selling trimmers, without reference to the specific nature of sales activities, is not competent summary judgment proof." 754 F.2d at 1221. No such inadequacy exists in the cases before us because the Gomez and Moonshadow affidavits list specific facts to support their conclusions.

The *Lujan* case provides no support, as can be demonstrated by completing the cite offered by the majority. Op. at 527–528, 917 P.2d at 256–257 ("the object of [Rule 56(e)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.") The remaining portion of the cite states: "Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case

to demand *at least one sworn averment of that fact* before the lengthy process of litigation continues." 497 U.S. at 888–89, 110 S.Ct. at 3188–89 (emphasis added). That is exactly what happened here.

*Jones* merely cites to a case involving a self-serving affidavit, which in that case was the plaintiff's own affidavit that mischaracterized another statement in the record. *See McDonnell v. Cournia*, 990 F.2d 963 (7th Cir.1993). Here, the experts' affidavits are neither self-serving nor even contradicted by any evidence. *Cf. McDonnell*, 990 F.2d at 969.

In *Jackson*, the affidavit contained conclusory, speculative expert opinion on the flow of asbestos in a building based on neither scientific studies nor personal knowledge of the affiant. 994 F.2d at 1303. In contrast, the affidavits before this court are based on specific scientific and psychological studies of the plaintiffs, as well as test results and personal interviews, and set forth specific facts to support the ultimate conclusions.

In *Various Slot Machines*, the experts' affidavits that slot machines "are not gambling machines [but] electronic point makers" were "pettifoggery." 658 F.2d at 699. That case is entirely distinguishable from the ones before us.

testify that a defendant displayed the symptoms of intoxication and was under the influence when arrested. *See Fuenning v. Superior Court,* 139 Ariz. 590, 605, 680 P.2d 121, 136 (1983). How can a so-called expert be allowed in a criminal case to testify to the elements of the charge (that a stick was a "dangerous instrument" and inflicted "serious bodily injury"), *see Williams,* 132 Ariz. at 160, 644 P.2d at 896, and another expert be unable to testify that his patient suffered from specified mental conditions that rendered him "unable to understand his legal rights or liabilities?" Finally, it is impossible to comprehend why an Arizona court errs by refusing to permit an expert to testify that a defendant suffered from a dissociative state and "therefore did not know the nature and quality of his actions," *State v. McMurtrey,* 136 Ariz. 93, 100, 664 P.2d 637, 644 (1983), but also errs when it permits an expert to swear that the plaintiff suffered from PTSD, among other things, and therefore was unable to manage his affairs. The majority not only fails to explain this but also fails to explain why, even if the conclusions are ignored, the factual details in the affidavits and supporting reports are insufficient to raise an issue of fact.

If is proper to ask a witness at trial whether the testator had "mental capacity sufficient to understand the nature and effect of his will" or "capacity to know the nature and extent of his property and the natural objects of his bounty," *see* Strong et al., McCormick on Evidence, 4th Ed. § 12 at 50 and n. 22 (1992), why can't a qualified witness be asked whether his patient had sufficient mental capacity to manage his affairs or understand his legal rights? As McCormick notes, in states such as Arizona, which have adopted Rule 704 of the Rules of Evidence, testimony stating opinions or conclusions on ultimate issues is permitted, and the "only recourse" against such questions is not to strike the testimony but "a request by the adversary that the questioner define his terms." McCormick, *supra* at 51.

Neither can the court's views of the admissability of these affidavits withstand comparison to decisions from other jurisdictions that follow rules similar to Arizona's. *See, e.g.,*

*TCBY Systems, Inc. v. RSP Co.,* 33 F.3d 925 (8th Cir.1994) (expert may give his factual conclusion that the site review evaluation process used by a franchisor was inadequate); *United States v. Van Dyke,* 14 F.3d 415 (8th Cir.1994) (error to refuse to allow expert attorney who had written the relevant bank regulation to give an opinion as to the application of the regulation to the case under consideration); *Maffei v. Northern Ins. Co.,* 12 F.3d 892 (9th Cir.1993) (in summary judgment proceedings, the court erred in striking the affidavit of an engineer defining the term "fire" as used in the policy's "hostile fire" exclusion); *Phillips v. Calhoun,* 956 F.2d 949, 952 (10th Cir.1992) (affidavits concerning the customary meaning and usage of terms in employee classification plans were properly admitted over objection that the affidavits merely contained legal conclusions).

Other examples abound. It is clear, however, from the text of the rule, the advisory note, the cases decided by this and other courts, and comments in the various treatises cited that, while there could be some question if the affidavits in this case had stated only that the plaintiffs were of unsound mind, at trial all courts would have allowed the experts to state the factual conclusion that the patients were unable to manage their affairs or to understand their legal rights. How then can such testimony in filed affidavits be insufficient to withstand motions for summary judgment when the affidavits recite the diagnosed medical condition, the basis for the diagnosis, and the factual conclusion to which the diagnosis led the doctor? If the cause of the plaintiff's mental problems was physical damage to the brain from a stroke, would the treating doctor be precluded from stating his or her diagnosis of aneurysm of the ascending aorta and resulting conclusion that the patient was thereby incapable of handling his affairs?

These experts, in fact, were not compelled by our rules to set forth anything more than their ultimate factual conclusions and underlying reasons—that their patients were unable to manage their affairs or understand their legal rights due to underlying mental problems. *See* Ariz.R.Evid. 705. The underlying evidentiary facts are required only if

asked for in cross-examination. *Id.* These defendants never raised the issue. Rather, *this court* raises it *sua sponte.* Both trial judges properly considered these affidavits in their rulings, and a trial court's admission of expert testimony will rarely be disturbed. *See* Weinstein and Berger § 702[2]; McCormick on Evidence § 13 (4th ed.).

Thus, the court's holding that the affidavits are insufficient legal conclusions not only ignores the content of the affidavits and the relevant rules of evidence but is entirely inappropriate when raised for the first time by this court. If the affidavits in this case were deficient, the parties should have made a motion to strike at the time they were filed. *Johnson v. Svidergol,* 157 Ariz. 333, 757 P.2d 609 (App.1988); C. Smith, Civil Trial Practice, 1994 Supp. § 315; *see* Ariz.R.Civ.P. 12(g). The purpose of this rule is to allow the offering party the opportunity to cure the alleged defects. *Johnson,* 157 Ariz. at 335, 757 P.2d at 611; see also *United States v. Western Electric Co.,* 337 F.2d 568, 575 (9th Cir.1964). However, neither defendant here raised the evidentiary sufficiency of the affidavits in the summary judgment proceedings, in the petitions for special action, or at this court. Certainly, the plaintiffs were not on notice that this court might *sua sponte* raise such an objection, and neither party has an opportunity to supplement the affidavits with whatever it is—the court does not tell us—that the majority might find of sufficient specificity. At this stage of the proceedings, it is unfair and without support to conclude, as the majority has, that the experts' affidavits are insufficient as a matter of law.

Second, having argued that the affidavits are inadmissible statements of ultimate facts or conclusions of law, the opinion then appears to reject its own position by stating that "[t]he affidavits here are not objectionable because they embrace an ultimate issue, but because they are without relevant foundation." Op. at 527, 917 P.2d at 256. Not surprisingly, the opinion does not explain what foundation is lacking because no logical explanation exists. As is patently clear from the affidavits and attached reports, there are numerous facts to support the experts' findings, and there is absolutely no indication

that the doctors were not qualified to make such opinions. Curiously, the opinion is never able to tell us what the plaintiffs could have done to cure the alleged foundational problem—because the affidavits contain all the foundation that the law requires for an expert opinion. *See* Ariz.R.Evid. 705. A foundational objection at this point in the proceedings, made *sua sponte* by this court, especially in light of the multitude of foundation provided, is without legal support.

The court next appears to back away from the foundational argument, failing to explain what about the affidavits is fatal to their foundation, and switches to a relevancy argument to invalidate the substance of the affidavits. The opinion states that "[t]he facts offered in support of the opinion evidence here are simply not relevant or material to the issue of unsound mind under the *Allen* test." Op. at 527, 917 P.2d at 256. The reader need only randomly select a page of the voluminous reports to refute this conclusion. For example, Dr. Enos wrote:

R[aymond] has no insight into his own problems. Due to his chronic, long standing emotional problems, he has no capacitgy (sic) to make reasonable decisions regarding what is good or not good for him. His father is correct. R[aymond] *should be in some controlled treatment environment. He is not capable of exercising decision making capacity regarding what he needs or does not need.*

Due to his lack of insight, persistent delusions and long-standing and distorted anger, R[aymond] is potentially dangerous . . . he has talked about wanting to kill the priests that originally molested him.

Notes of Dr. Enos, Gomez Home Visit 11/5/93 at page 7 (emphasis added). How are facts and opinions such as those contained in the affidavits and attached reports "not relevant or material to the issue of unsound mind under the *Allen* test," when *Allen*'s issues are one's ability to manage one's affairs or understand one's legal rights? The majority never tells us, and there is no logical answer.

In a further search for a justification to *sua sponte* nullify the affidavits, the opinion quotes part of the Introductory Note to Ariz.

R.Evid., Art. VII. Citing the Note, the majority argues that the affidavits are "without relevant foundation" and thus cannot be considered under Rules 703 and 705. But the preceding portion of the majority's quoted sentence from the Introductory Note reads:

In jury trials, *if there is an objection* and if facts or data upon which opinions are to be based have not been admitted in evidence at the time the opinion is offered, the court may admit the opinion subject to later admission of the underlying facts or data. . . .

(Emphasis added.)

The first part of the sentence illustrates that the Note is completely inapplicable to the case before this court. Here, neither party objected—at any point—to the affidavits or supporting documents for any of the reasons—ultimate issue, irrelevancy, or lack of foundation—that the majority has alternatively advanced and then abandoned. "Advocacy, after all, has its limits." *State v. McKinney*, 185 Ariz. 567, 589, 917 P.2d 1214, 1236 (1996), (Martone, J. dissenting). This is particularly true when, as in this case, we are not conducting independent review. A *sua sponte* objection by a court of last resort is certainly not what the Introductory Note referenced; nor is such an objection permitted by the rules of evidence.

In dismissing the affidavits, the court's opinion turns *Orme School* on its head. That case does not support the court's action today. An action may be dismissed if the non-moving party has done no more than create a "scintilla or doubt," Op. at 528, 917 P.2d at 257, but *Orme* also stands for the proposition that "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge. . . ." *Orme School v. Reeves*, 166 Ariz. 301, 309–10, 802 P.2d 1000, 1008–09 (1990). This is especially true when the defense asserted—the statute of limitations—is disfavored, as it is in this state. *Ulibarri*, 178 Ariz. 151, 871 P.2d 698.

The opinion also fails to mention that Moonshadow probably did not even need to present evidence of an unsound mind. The defendants' initial motion for summary judg-

ment, in one page of argument, applied only a strict numerical analysis to the dates of filing and last incident of abuse. The trial judge eventually denied summary judgment to defendants, in part due to remaining factual issues and equity but also because the defendants "raise [the evidentiary questions regarding tolling] for the first time in the response to the motion for reconsideration, and the court therefore does not think that the plaintiff should have anticipated it in her motion for reconsideration." Mem.Dec. 5/25/94 at 3.

In light of the uncontroverted medical testimony provided by the treating psychologists for Gomez and Moonshadow, and given the court's adoption of the *Allen* definition of unsound mind, one might ask what showing a plaintiff claiming to be the victim of sexual abuse must make to raise a factual issue of unsound mind. If the facts raised and expert opinions advanced in these cases are insufficient to raise an issue, what is sufficient? *See* Ariz.R.Evid. 702. Again, the court does not explain, except by further errors in characterizing the record. First, the opinion attempts to transform the issue into whether post-traumatic stress disorder is sufficient to meet the unsound mind test. Op. at 525, 917 P.2d at 254. But the opinion's preoccupation with PTSD is factually incorrect and legally irrelevant. For instance, the majority says that neither plaintiff "claimed to be insane or incompetent" but only "argue that their post-traumatic stress disorder is sufficient to toll the statute of limitations." Op. at 525, 917 P.2d at 254. But this is not what the plaintiffs claim. Rather, they claim that the childhood abuse resulted in PTSD and numerous other conditions that, taken together, made them unable to manage their affairs or understand their legal rights or liabilities. This is the exact test the majority adopts. Op. at 525, 917 P.2d at 254.

The opinion makes a similar error in discussing the legal significance of PTSD: "To our knowledge, no state has found that a diagnosis of post-traumatic stress disorder alone, is sufficient to constitute insanity or unsound mind within the meaning of the relevant statute." Op. at 526, 917 P.2d at 255. This is no doubt true but quite irrele-

vant because plaintiffs do not claim that PTSD alone is their problem or that PTSD alone is sufficient to meet the *Allen* test—the test on which they rely. They provide facts and qualified opinion evidence to support the argument that they meet *Allen*'s definition of unsound mind.

Having approved the *Allen* test,[4] the opinion promptly abandons it by pointing out that neither Gomez nor Moonshadow claimed to be insane or incompetent. Op. at 525, 917 P.2d at 254. Incompetency is not the test. Neither is insanity. The statute speaks of unsound mind; our cases define it, and the court expressly adopts that definition and then seemingly abandons it. The majority needs to follow one legal test or the other. It should refrain from changing the rule of law, page by page, from unsound mind, as defined in *Allen,* to other tests such as incompetency. When the court adopts the *Allen* test, then the evidence of plaintiffs' inability to manage their day-to-day affairs or understand their legal rights or liabilities creates jury issues, as both trial judges plainly understood. Certainly it is possible to understand how a woman whose father sodomized and raped her, kicked and abused her, urinated in her mouth, smeared her with feces, penetrated her digitally and by sexual organ, and "with various physical objects" (the opinion's euphemism for a gun inserted in her vagina) might well be rendered unable by fear and humiliation to manage her day-to-day affairs or understand her legal rights.

Indeed, the opinion quite ignores the mind-set of a victim so abused. But none of us has been exposed to the type of abuse or sequelae described by the facts of the Moonshadow case, which can only be summarized—I hope—as beyond the pale of ordinary human experience. To require entry of defense judgment despite the record evidence in these cases is to give sexual abusers who have held positions of authority over their victims a free ride from the civil legal system. Abuse the victim seriously enough, frighten the victim badly enough, intimidate the victim thoroughly enough, scare and hurt the victim so severely that he or she cannot face the world or the abuser, and the statute of limitations will provide a safe harbor from civil prosecution.

On evidence such as that presented in these cases, our jurors understand much more than we do. The trial judges were correct in trusting the jury to decide if these plaintiffs had truly been disabled by an unsound mind and the statute of limitations thereby tolled. We should never have intervened by accepting special action jurisdiction, and we should not now interfere with the trial judges' conclusions that the facts were for the jury to decide.

I dissent.

ZLAKET, V.C.J., concurs.

---

4. The test adopted in *Allen* and followed in *Nelson* is the rule generally followed throughout the country. *See* 51 Am.Jur.2d Limitations of Actions § 187, at 755. The test is that a person is of unsound mind, as that term is used in disability statutes, when the person "is unable to manage his affairs *or* to understand his legal rights or liabilities." Op. at 525, 917 P.2d at 254, quoting *Allen,* 21 Ariz.App. at 270, 518 P.2d at 589. Before getting the rule stated correctly, the opinion attempts to equate unsound mind with insanity. Op. at 527, 917 P.2d at 256. It does this by quoting the title of the tolling statute, which, of course, as it acknowledges, is not the rule for interpretation of the words contained in the body of the statute. *Id.* A more serious error is the court's attempt to cite Arizona cases for the proposition that unsound mind equates with insanity. *Fleming v. Black Warrior Copper Co.* merely holds that a plaintiff properly alleged application of the unsound mind provision of the tolling statute by stating in his complaint that he had been insane at all relevant times pertaining to the transaction. 15 Ariz. 1, 8, 136 P. 273, 275 (1913). A holding that insanity falls within the category of unsound mind is obviously correct but far short of holding that the phrases are synonymous. Nor do our cases really refer to unsound mind as insanity, as the opinion states. Op. at 524, 917 P.2d at 253. *Western Coal & Mining Co. v. Hilvert,* 63 Ariz. 171, 160 P.2d 331 (1945), cited for that proposition, does not so hold at all. The case does not even deal with the unsound mind disability but, rather, with absence from the state. The court mentions the word "insanity" only after holding that the Arizona statutes "do not recognize absence of defendant from the state as a disability." *Id.* at 183, 160 P.2d at 336. The court then, in passing, stated that "there can be no room for doubt that the disabilities mentioned in [the tolling statute] are confined to the minority, insanity, or imprisonment ... of the plaintiff." *Id.* To imply that our cases equate unsound mind with insanity is plainly incorrect.

## APPENDIX A

*AFFIDAVIT OF FRANCIS ENOS, Ph.D.*
STATE OF ARIZONA

ss.

County of Maricopa

FRANCIS ENOS, Ph.D., being first duly sworn and upon his oath, deposes and states as follows:

1. I am an adult resident of Phoenix, Arizona and am competent to make this affidavit.

2. I am a licensed clinical and consulting psychologist in the State of Arizona. My resume is attached hereto as Exhibit A.

3. Ramon Gomez was referred to me for purposes of psychological evaluation and counselling.

4. Reports which I have issued with respect to Ramon Gomez are attached hereto as Exhibit B.

5. I have seen Ramon for interview, counselling and psychometric testing. I have also interviewed members of Ramon's family and attempted to derive his social history.

6. From the foregoing, it is my professional opinion that to a reasonable degree of psychological certainty, Ramon suffers from "post-traumatic stress disorder," and other psychological disorders, all of which are serious.

7. From the foregoing, it is also my professional opinion to that to a reasonable degree if psychological certainty, the cause of these injuries was sexual abuse by three (3) Roman Catholic priests after approximately the age of 12. The bases and foundation of my opinion are set forth in my reports attached hereto.

8. It is also my professional opinion that to a reasonable degree of psychological certainty, Ramon has been of "unsound mind" ever since the acts of sexual abuse occurred. In coming to that opinion, my definition of "unsound mind" is that Ramon has been unable to manage his affairs or to understand his legal rights or liabilities. The foundation and bases for my opinion are also set forth in the attached reports.

FURTHER AFFIANT SAYETH NOT.

/s/ Francis Enos
/s/ Francis Enos, Ph.D.

SUBSCRIBED AND SWORN to before me this 7th day of December, 1993.

/s/ Carol H. Chapman
/s/ Notary Public

My Commission Expires:

My Commission Expires July 28, 1996

## APPENDIX B

*AFFIDAVIT OF STUART LITVAK, Ph.D.*
STATE OF ARIZONA

ss.

County of Maricopa

STUART LITVAK, Ph.D., being first duly sworn and upon his oath, deposes and states as follows:

1. I am an adult resident of Phoenix, Arizona and am competent to make this affidavit.

2. I am a licensed clinical and consulting psychologist in the State of Arizona. I obtained my Bachelor of Arts degree from UCLA with a major in psychology in 1962. In 1965, I obtained my M.A. from California State, Los Angeles, also in psychology. In 1970, I obtained my Ph.D. from Arizona State University. From 1970 to the present time, I have been a certified or (presently) a licensed clinical psychologist in the State of Arizona. From 1970 through 1974, I was in private practice in Phoenix, Arizona. From 1974 through 1979, I was the Director of Arizona Counselling and Psychological Services. From 1980 through the present, I have been a clinical and consulting psychologist in Phoenix. I have also been an expert witness in the Maricopa County court system, in both the criminal and domestic relations divisions. I have written eight (8) books in psychology, including *Unstress Yourself, Use Your Head, How to Study Psychology, In the World But Not of It, Seeking Wisdom, More Ways to Use Your Head, Toward a New Brain* and the *Whole*

*Brain Catalog* (in progress). Additionally, I have taught undergraduate psychology courses at Arizona State University and graduate psychology courses at the University for Humanistic Studies. I have also taught various courses for professionals, students and lawyers. I am a diplomate of the American Board of Professional Disability Consultants, and am a member of the Institute for Cultural Research, the Institute for the Study of Human Knowledge, the American Psychological Association, the Arizona Psychological Association, the American College of Forensic Psychology and American Psychology–Law Society.

3. Ramon Gomez was referred to me for purposes of psychological evaluation and counselling.

4. I have taken over the care of Ramon upon the heart attack of Dr. Frank Enos, psychologist, who had been working with Ramon, but required bypass surgery. In performing my evaluation, I have been provided and reviewed a voluminous set of psychiatric and psychological records of Ramon from Camelback Samaritan Hospital, TriCity Behavioral Services, Maricopa East Treatment Alternatives, a psychological evaluation by Jeffrey Estrada, Ph.D., a psychiatric report by Dr. Della Medallena, a psychiatric report by Dr. Rajiv Kumar and psychological reports of Francis Enos, Ph.D. dated August 28, 1993 and November 6, 1993. I have reviewed all of these documents, which are routinely and regularly relied upon by a clinical psychologist in making evaluations and providing treatments.

5. Additionally, I have interviewed Ramon, administered a full battery of psychodiagnostic tests, and obtained a social history. The testing is more fully documented in my report, dated November 26, 1993. I met with Ramon on November 20, 1993, November 23, 1993, November 24, 1993, and December 2, 1993 for a total office time of about ten (10) hours.

6. From the foregoing, it is my professional opinion and considered conclusion that to a reasonable degree of psychological certainty, Ramon suffers from "post-traumatic stress disorder," including major depression with recurrent, severe and psychotic features, and a schizotypal personality disorder, with narcissistic and borderline features. Additionally, Dr. Enos has determined that Ramon has a delusional disorder. This is the type of opinion I rely on in my field. I cannot rule out at this time the possibility of delusional disorder and schizo-affective disorder. All of these psychological disorders are serious injuries, which affect Ramon's ability to function on a day to day basis, and have ever since the incidents of sexual abuse as more fully described herein.

7. From the foregoing, it is also my professional opinion and considered conclusion that to a reasonable degree of psychological certainty, the cause of these injuries was the sexual abuse inflicted upon Ramon by three (3) Roman Catholic priests whom he would have held in high esteem when Ramon was approximately between 12 and 14 years old, and in a particularly vulnerable state. The basis and foundation for my opinion is that from all indications, Ramon was functioning reasonably well and normally in his childhood up until the points in time of the sexual abuse. It has been reported that because of the large family setting which Ramon was in, he enjoyed special treatment that he was receiving at the Church where his family belonged prior to and during the sexual abuse. Additionally, it has been reported by his parents and Ramon that there were no abnormal problems or school irregularities up to that point in time. Sexual abuse of children is known to have long lasting effects. It is well known to cause feelings of guilt, embarrassment and humiliation. Sex abuse victims also often turn to drugs and alcohol. In this case, the molestation and rape by Fr. Florez likely had an even greater effect than some other cases because of the traumatic nature of the events. According to the patient, the second incident of sexual abuse, the rape, was extremely violent. Additionally, because of his family's devout faith to the Roman Catholic Church, Ramon's complaint about sexual abuse by Fr. Florez prior to the rape was not believed by his parents at the time. After the rape, it is reported that Fr. Florez called Ramon's father and informed him that Ramon had "come on" to him. This

resulted in Ramon being branded as a homosexual and being severely ostracized by his parents. Apparently, from that point on, Ramon became the "black sheep" of the family, and was made fun of by his siblings. Ramon had nowhere to turn for help since the Church and his parents had rejected his calls for help. Thus, the incidents became seriously internalized without a real outlet for help.

8. It is also my professional opinion to a reasonable degree of psychological certainty that Ramon Gomez has been of "unsound mind" ever since these acts of sexual abuse occurred. I define "unsound mind" here as being unable to manage one's affairs or to understand one's legal rights or liabilities. The evidence reflects to me that Ramon has been of "unsound mind," the inability to manage his affairs and to understand his legal rights, ever since the incidents of sexual abuse for a substantial number of reasons:

a. After the rape by Fr. Florez, Ramon, as a minor, returned to the Church where the rape occurred and was asked to give massages and was seduced by Frs. Perez and Giandelone;

b. Ramon ran away from home after numerous acts of sexual abuse by Frs. Perez and Giandelone and after not being believed at home because of the strong emotional attachment to the Church his parents had;

c. Ramon dropped out of high school, has never finished high school, nor obtained a G.E.D.;

d. Ramon has never been able to adequately hold down gainful employment nor been able to work towards any goal in the way of employment for any substantial period of time;

e. It appears that Ramon has never been able to maintain a place of residence for any substantial length of time and has drifted in and out of his parents' home, friends' homes and/or relatives' homes for a period of years;

f. It has been reported by Ramon that he has had disturbing flashbacks from time to time concerning the various acts of sexual abuse—this is consistent with other victims of sexual abuse;

g. It has been reported by Dr. Enos that Ramon from time to time suffers from delusions concerning his activities—he has reportedly even called governmental authorities concerning his own parents;

h. It is reported that the acts of sexual abuse by the priests were not discussed with anyone from or about the time of the acts until the incident with Fr. Florez was discussed with a "Fr. Carl" in late 1990. The incidents of sexual abuse with Frs. Perez and Giandelone appear to not have been reported until counselling in early 1992—This is consistent with coping devices of victims of sexual abuse;

i. From time to time, Ramon has squandered whatever money he has had, including reported trips to Europe, yet, he cannot afford any transportation whatsoever, nor his own residence.

j. The disorders as outlined above are known to develop immediately after traumatic events such as sexual abuse, with continued deterioration over time.

k. Ramon suffers from chronic depression and stress to the extent that holding down gainful employment and maintaining healthy relationships are very difficult to impossible;

l. Ramon has been almost totally reliant upon others to assist him ever since the acts of sexual abuse occurred;

m. It is reported that Ramon is at a borderline mentally retarded stage due to his failure to progress intellectually—this is demonstrated by the "WAIS" test administered by Dr. Enos;

n. Ramon has severe sexual identity problems and believes he is homosexual, or bisexual at minimum, but yet he has had heterosexual relationships as well;

o. From time to time, Ramon has had to take medications to protect him from the effects of panic attacks and stress as well as antidepressants;

p. Ramon has, at times, had violent tendencies, which contribute to his inability to manage his affairs;

q. Ramon has been in a number of abusive relationships, where he has been physically and emotionally abused by his partner(s);

r. Ramon has from time to time participated in prostitution and stripping;

s. For a majority of his life, Ramon has been unable to understand the true and full nature of his injuries and his legal rights with respect to those acts;

t. Whether or not he has received it, Ramon has been in need of in- and out-patient psychological help ever since the incidents of sexual abuse;

u. Ramon has reportedly had a very difficult time maintaining for substantial durations of time any healthy social relationships whatsoever;

v. Ramon has suffered from hallucinations from time to time;

w. Ramon has indicated suicidal tendencies from time to time;

x. Ramon has a history of acute over-sensitivity. My report of November 26, 1993 and the reports of Dr. Francis Enos are incorporated by reference herein and attached hereto.

9. Because Ramon has been of "unsound mind," this prevented him from bringing suit at an earlier date.

10. The symptoms reported by Ramon are typical of patients with similar disorders.

11. The foregoing also indicates that Ramon has been under extreme duress since the incidents of sexual abuse. The sexual abuse of Ramon by persons holding the authority and respect of priests were coercive acts. Because of the coercive acts, Ramon probably began to feel that the sexual acts with priests were acceptable. Ramon lost the freedom of will to prevent the sexual abuse, to disclose all of it, and ultimately bring suit at an earlier date. Given what happened to Ramon, a reasonable minor in his shoes probably would not have been able to resist the abuse and the events thereafter.

12. It is reported that Ramon did not discuss the incidents of sexual abuse with anyone from about or near the time of the sexual abuse until Ramon mentioned the incidents involving Fr. Florez to a "Fr. Carl" in late 1990. The patient reports that the incidents involving Frs. Perez and Giandelone were not remembered nor discussed with anyone until discussions with attorneys and counsellors after July, 1991. This explanation of recall of abuse is consistent with my work with a number of survivors of abuse and is not uncommon. Numerous survivors of childhood sexual abuse experience some form of repression. Such repression is a survival coping skill. It is a mechanism which enables victims of childhood sexual abuse, like Ramon, to bury the trauma in order to emotionally survive and develop. It is probable in the case of Ramon Gomez that these traumatic events were repressed. It is also my opinion that there would not be a full derepression until all of the acts of sexual abuse were discussed in depth. This did not occur when Ramon mentioned the abuse by Fr. Florez only.

13. It is also my professional opinion that Ramon has been unable for a majority of his life to understand what has happened to him and his legal rights with respect to those acts.

FURTHER AFFIANT SAYETH NOT.

/s/ Stuart Litvak, Ph.D.
/s/ Stuart Litvak, Ph.D.

SUBSCRIBED AND SWORN to before me this 7th day of December, 1993.

/s/ Carol H. Chapman
/s/ Notary Public

My Commission Expires:

My Commission Expires July 29, 1996