Kenneth SMITH

v.

Rev. William C. O'CONNELL, et al.

Michael KELLY

v.

Robert MARCANTONIO, et al.

Stephen KELLY

v.

Robert MARCANTONIO, et al.

Civil Action Nos. 93–615–T, 93–660–T, 93–661–T.

United States District Court, D. Rhode Island.

March 17, 1998.

A. Cappalli, Woonsocket, RI, Timothy J. Conlon, Providence, RI, for plaintiff Kenneth Smith.

Thomas R. Bender, William A. Curran, James T. Murphy, Hanson, Curran, Parks & Whitman, Providence, RI, William T. Murphy, Providence, RI, for defendant William C. O'Connell, St. Mary's Church Corporation.

Thomas R. Bender, James T. Murphy, William T. Murphy, Hanson, Curran, Parks & Whitman, Providence, RI, R. Christopher Barden, R.C. Barden & Associates, Plymouth, MN, Charles H. Wilson, Washington, DC, for defendant Kenneth Angell.

Thomas R. Bender, William A. Curran, James T. Murphy, Mark W. Dana, Hanson, Curran, Parks & Whitman, Providence, RI, William T. Murphy, Providence, RI, R. Christopher Barden, R.C. Barden & Associates, Charles H. Wilson, Washington, DC, for defendant Louis A. Gelineau.

Thomas R. Bender, Hanson, Curran, Parks & Whitman, Providence, RI, R. Christopher Barden, R.C. Barden & Associates, Plymouth, MN, Charles H. Wilson, Washington, DC, for defendant Church of the Holy Ghost North Tiverton.

Thomas R. Bender, James T. Murphy, Mark W. Dana, Hanson, Curran, Parks & Whitman, Providence, RI, William T. Murphy, Providence, RI, R. Christopher Barden, R.C. Barden & Associates, Charles H. Wilson, Washington, DC, for defendant Roman Catholic Bishop of Providence.

Thomas R. Bender, James T. Murphy, Hanson, Curran, Parks & Whitman, Providence, RI, William T. Murphy, Providence, RI, R. Christopher Barden, R.C. Barden & Associates, Charles H. Wilson, Washington, DC, for defendant Daniel P. Reilly.

Susan E. McGuirl, Richard C. Bicki, Cerilli, McGuirl & Bicki, Providence, RI, Lise M. Iwon, Laurence and Iwon, Wakefield, RI, for plaintiffs Michael Kelly, Stephen Kelly.

Gerald C. DeMaria, Paul S. Callaghan, Higgins, Cavanagh & Cooney, Providence, RI, for defendant Robert Marcantonio.

Richard Daniel Prentiss, McGovern, Noel & Benik, Providence, RI, Carl P. DeLuca, DeLuca & DeLuca, Providence, RI, Richard William T. Murphy, Providence, RI, R. Christopher Barden, R.C. Barden & Associates, Charles H. Wilson, Washington, DC, for

defendant Daniel P. Reilly, St. John Vianney Church, Raymond A. Beaulieu.

### MEMORANDUM AND ORDER GRANTING SUMMARY JUDGMENT

TORRES, District Judge.

The defendants in these cases have moved for summary judgment on the ground that the plaintiffs' claims of childhood sexual abuse by priests serving in the Roman Catholic Diocese of Providence are barred by the statute of limitations. The principal issues presented are:

1. Whether a temporary inability to remember the alleged acts of abuse, a failure to recognize those acts as tortious or a difficulty in overcoming a reluctance to "re-live" the matter by initiating legal action constitutes a condition of "unsound mind" that tolls the period of limitations; and

2. Whether the failure of church officials to disclose their alleged knowledge of previous sexual misconduct by the priests amounted to "fraudulent concealment" of the plaintiffs' causes of action, for tolling purposes.

Because I find that "unsound mind" includes only conditions that render a person incompetent or incapable of managing his or her daily affairs; and, because I also find that "fraudulent concealment" of a cause of action requires something more than a defendant's failure to volunteer information that might be useful in attempting to prove that defendant liable for a tortious act, I answer both questions in the negative and, therefore, grant the defendants' motions for summary judgment.

### The Factual Background

The plaintiffs are young men who allege that, when they were minors, they were sexually abused by priests serving in the Roman Catholic Diocese of Providence. The defendants are the priests, various diocesan officials and the churches to which the priests were assigned. The diocesan officials and churches are, hereinafter, jointly referred to as the "hierarchy defendants."

The plaintiffs seek to recover damages for a variety of state law torts and have invoked this Court's diversity jurisdiction. The allegations underlying the plaintiffs' claims are summarized in this Court's Memorandum and Order denying the defendants' motions to dismiss for lack of subject matter jurisdiction. *See Smith v. O'Connell*, 986 F.Supp. 73, at 75 (D.R.I. 1997). However, for purposes of these motions for summary judgment, a more detailed recitation of those allegations together with the facts developed during discovery and the undisputed facts set forth in the parties' affidavits is required.

Kenneth Smith avers that he was abused by Fr. William O'Connell during the period between 1972 and 1977 while he was in high school.[1] Stephen and Michael Kelly aver that they were abused by Fr. Robert Marcantonio. Stephen alleges that the assaults on him occurred between 1975 and 1981 while he was in high school and Michael alleges that he was assaulted between 1981 and 1985 when he was a high school and college student.

Kenneth Smith filed suit on November 3, 1993, when he was thirty-three years old. Stephen and Michael Kelly filed their suits on December 1, 1993, when they were thirty-two and twenty-six years of age, respectively. Thus, it is clear that all of the plaintiffs attained the age of majority more than three years before commencing these actions.[2]

---

1. Rev. William C. O'Connell has not joined in the motion for summary judgment. No proof of service upon him has been filed. Moreover, although it appears that Fr. O'Connell died after this action was commenced no formal suggestion of death has been made on the record nor has any motion been filed to substitute his estate as a party defendant.

2. Prior to July 1, 1988, Rhode Island law provided that the age of majority, for statute of limitations tolling purposes, was twenty-one. R.I.Gen. Laws § 9–1–19 (amended 1988). Effective July 1, 1988, it was lowered to eighteen, 1988 R.I.Gen.Laws 107 (amending R.I.Gen.Laws § 9–1–19), but that amendment is inapplicable to this case because Smith became twenty-one on April 10, 1981; Stephen Kelly became twenty-one on August 1, 1982 and Michael Kelly became twenty-one on February 26, 1988.

## Kenneth Smith

Smith reached the age of majority in 1981, approximately five years after his alleged abuse ceased. At that time, he was a full-time student at the University of Rhode Island and participated in the ROTC program as a member of the Rhode Island National Guard. As part of his ROTC obligation, he successfully completed six weeks of reconnaissance training at Fort Bragg, North Carolina. He later dropped out of school because of poor grades, took a job as a security guard and was married. Shortly thereafter, he quit his job as a security guard because the irregular hours prevented him from spending sufficient time with his wife. For the next three years, he held a series of jobs as an insurance agent, a maintenance worker, a proofreader and a parcel handler for UPS. During that period, he fathered two children and earned a commission as an officer in the National Guard where he served as an infantry platoon leader. A year later, Smith resigned from the National Guard because he felt that his unit lacked professionalism and because the commitment interfered with his family responsibilities.

In 1986, Smith obtained employment with an advertising firm. Several months later, he filed a bankruptcy petition because he was unable to meet the financial obligations of supporting his family. His employment with the advertising firm continued until July of 1991 when he was laid off due to lack of work. During his tenure there, he was promoted several times and, eventually, became a production manager. After being laid off, Smith obtained a position as a plant manager for a recycling company, a position that he held at the time this action was commenced.

Between 1988 and 1992, Smith underwent psychiatric counseling for difficulties arising, primarily, from the relationship between his parents. He also was treated for substance abuse several times during the 1980s and early 1990s, a problem that may have begun in 1975 when he was fifteen. Smith never was hospitalized for any of these problems. Nor was he ever placed under guardianship or conservatorship.

Smith asserts that he had no memory of the alleged assaults until sometime in 1991 or 1992 when his mother made reference to a trip to Ireland that Smith took with Fr. O'Connell in 1977.

## Michael Kelly

The alleged assaults on Michael Kelly began in 1981 and continued until 1985 when he was a junior in high school. In 1986, he graduated, having played varsity baseball and basketball and having played in the school band. One year later, he moved to Canada with his mother and worked as a laborer in his cousin's construction firm for several years. In 1992 he obtained employment as a sales consultant for an electronics company and eventually, was promoted to a managerial position, a job that he held when this action was commenced.

Michael asserts that he drinks frequently and often has problems sleeping. However, there is no indication that he ever was treated for any substance abuse problem or mental disorder. Nor has any guardian or conservator ever been appointed for him.

Michael acknowledges that he has been conscious of the assaults on him ever since they occurred. However, he contends that he did not appreciate their wrongful nature until sometime in 1991 because Fr. Marcantonio told him that such activities were part of his religious training regarding sexuality.

## Stephen Kelly

According to Stephen Kelly, the assaults on him began in 1975 and continued until 1981 when he was a junior in college. The following year, Stephen, who previously had been an honors student, stopped going to class and began smoking marijuana on a regular basis. As a result, his grades suffered, he withdrew from school and he returned to live with his parents. After briefly working and taking courses as a part-time student at the University of Rhode Island, Stephen moved to Nantucket where he lived with his girlfriend for approximately four years and worked as a carpenter and scallop shucker. During 1987 and 1988, Stephen and his girlfriend lived in communes in California and Vancouver where Stephen performed odd jobs in exchange for their accommodations. However, when Stephen was unable to fulfill his work commitments, he

left the commune and began collecting welfare benefits. At that time, he also sought counseling for the first time. He went to two counseling sessions during which he mentioned the incidents involving Fr. Marcantonio.

After several months, Stephen returned to the commune in Vancouver where he remained for approximately two years. Upon discovering that his girlfriend was having an affair, Stephen experienced "another round of welfare and depression" and moved to Victoria. In the spring of 1991 he returned to the Vancouver commune in an effort to resurrect his relationship with his girlfriend. Stephen remained there and managed a one-acre garden until this suit was filed.

Stephen states that, during the period between the alleged assaults by Fr. Marcantonio and the commencement of this action, he frequently used marijuana and LSD and that he had occasional bouts of depression and suicidal thoughts. However, he never was hospitalized or otherwise treated for substance abuse. Nor did he undergo any form of counseling except for the two counseling sessions in Vancouver.

Stephen acknowledges that he always has had a memory of the incidents that are the subject of his complaint. However, like Michael, he asserts that, because Fr. Marcantonio assured him that such activity was an appropriate part of his religious training in sexuality, it was not until sometime in 1991 that he appreciated the impropriety of Marcantonio's conduct.

### The Statutory Framework

#### I. The Statutes of Limitations

■ Until 1992, the statute of limitations set forth in R.I.Gen.Laws § 9–1–14(b) applied to all claims of childhood sexual abuse. It requires such claims to be brought within three years after the cause of action "accrues."[3] Under § 9–1–14(b), a cause of action for childhood sexual abuse accrues on

the date of injury. *Kelly v. Marcantonio,* 678 A.2d 873, 877 (R.I.1996).

In 1992 and 1993 the Rhode Island General Assembly lengthened the period of limitations for claims against *perpetrators* of childhood sexual abuse by enacting what is now R.I.Gen.Laws § 9–1–51. That section permits an action against the "perpetrator" to be brought up to seven years after the victim "discovers" or should have discovered that the abuse occurred.[4]

■ Section 9–1–51 did not alter the "three years from accrual" period of limitations prescribed by § 9–1–14(b) which still governs claims against *non* -perpetrators. *Kelly,* 678 A.2d at 877. Nor did § 9–1–51 revive any cause of action against a perpetrator that was time barred prior to its enactment. *Id.* at 883.

#### II. The Tolling Provisions

■ In order to determine whether an action is time barred, one must consider both the period of limitations and the circumstances under which it is tolled. In this case, there are three tolling provisions at issue.

Two of those provisions are contained in § 9–1–19 which prevents the period of limitations from running against a minor until the minor reaches the age of majority and also tolls the period of limitations applicable to persons of "unsound mind." Section 9–1–19 provides, in relevant part, as follows:

> 9–1–19. *Disability postponing running of statute.*—If any person at the time any such cause of action shall accrue to him or her shall be under the age of [twenty-one (21) years], or of unsound mind ... the person may bring the cause of action, within the time limited under this chapter, after the impediment is removed.

R.I.Gen.Laws § 9–1–19.

The third provision is found in § 9–1–20 which postpones accrual of a cause of action

---

**3.** R.I.Gen.Laws § 9–1–14(b) provides that "[a]ctions for injuries to the person shall be commenced and sued within three (3) years next after the cause of action shall accrue, and not after."

**4.** The 1992 amendment adopted the discovery rule for purposes of determining when a cause of action accrues. 1992 R.I.Pub.Laws 84. The 1993 amendment lengthened the period of limitations to seven years from the date of accrual. 1993 R.I.Pub.Laws 274.

that has been fraudulently concealed. It provides:

> 9–1–20. *Time of accrual of concealed cause of action.*—If any person, liable to an action by another, shall fraudulently, by actual misrepresentation, conceal from him or her the existence of the cause of action, the cause of action shall be deemed to accrue against the person so liable at the time when the person entitled to sue thereon shall first discover its existence.

R.I.Gen.Laws § 9–1–20.

In this case, the defendants do not dispute that § 9–1–19 tolled the period of limitations until the plaintiffs attained the age of twenty-one. However, the defendants vigorously dispute the plaintiffs' contention that their alleged inability to remember the acts of abuse, recognize them as wrongful or bring themselves to institute suit further tolled the statute of limitations pursuant to the "unsound mind" provision contained in R.I.Gen. Laws § 9–1–19. The hierarchy defendants also dispute the contention that their alleged failure to disclose prior sexual misconduct by the priests amounted to "fraudulent concealment" within the meaning of R.I.Gen.Laws § 9–1–20.

### The Summary Judgment Standard

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 246, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is material if it directly relates to the legal elements of a claim or defense to an extent that could affect the outcome of the case. *Id.*

In determining whether a genuine dispute of material fact exists, it is incumbent upon the Court to view the evidence in the light most favorable to the nonmovant and to draw all reasonable inferences in that party's fa-

vor. *United States v. One Parcel of Real Property,* 960 F.2d 200, 204 (1st Cir.1992).

When a motion for summary judgment is directed against a party that bears the burden of proof, the movant may make an initial showing of entitlement to summary judgment by producing evidence that negates an essential element of the nonmovant's case or by demonstrating an absence of record evidence to support the nonmovant's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir.1997). The nonmovant, then, has the burden of demonstrating the existence of a genuine issue of material fact requiring a trial. *Dow v. United Bhd. of Carpenters and Joiners,* 1 F.3d 56, 58 (1st Cir.1993). More specifically, the nonmovant is required to establish that it has sufficient evidence to enable a jury to find in its favor. *See DeNovellis,* 124 F.3d at 306.

### Discussion

■ As already noted, all of these actions were commenced more than eight years after the alleged abuse occurred and more than five years after the plaintiffs attained the age of majority for statute of limitations purposes.[5] Moreover, when the plaintiffs became adults, the statute of limitations for all claims of childhood sexual abuse was the three-year period set forth in R.I.Gen.Laws § 9–1–14(b). That is because § 9–1–51 which lengthened the period of limitations for claims against perpetrators to seven years did not take effect until June 17, 1992, and cannot be applied retroactively to claims that already were barred at the time of its enactment. *Kelly,* 678 A.2d at 883. Under the "minority" tolling provisions of § 9–1–19, the statute of limitations on the claims of Kenneth Smith, Stephen Kelly and Michael Kelly would have expired on April 10, 1984, August 1, 1985 and February 26, 1991, respectively. Therefore, their actions are barred unless the period of limitations was tolled further by the "unsound mind" provision of § 9–1–19 and/or the "fraudulent concealment" provision of § 9–1–20. The burden is on the plaintiffs to establish the applicability of

---

**5.** *See supra* note 2 and accompanying text.

those provisions. *See Bonilla–Aviles v. Southmark San Juan, Inc.*, 992 F.2d 391, 393 (1st Cir.1993).

### I. *Unsound Mind*

The condition that Smith claims rendered him of "unsound mind" differs from the conditions described by the Kellys. As already noted, Smith asserts that the trauma of the abuse he experienced caused him to repress any memory of the assaults until sometime in 1991. In support of that assertion, he has presented a report by Dr. Barry Plummer, a psychiatrist who examined Smith in preparation for this lawsuit. Dr. Plummer states that "[t]hese memories were repressed due to the intense fear, shame, and intense emotional arousal that these abusive episodes caused him. Because of his incapacitated condition the repressed memories were not available to him until approximately 1991 when they were triggered by comments made by his mother."

Early in this litigation, the Kellys also appeared to be claiming that they suffered from repressed memory. However, they now acknowledge that they have been aware of the alleged assaults from the time that those assaults occurred. Although the basis for their claim of "unsound mind" still is somewhat ambiguous, it appears to rest, primarily, on the assertion that they did not understand the impropriety of Fr. Marcantonio's conduct until long after it occurred and/or that they were unable to bring themselves to "re-live" their trauma by instituting suit.

In support of those contentions, the Kellys cite the report of Dr. Stuart Grassian, a psychiatrist who was retained for the purpose of testifying in this case. Based upon his review of the Kellys, medical records, their deposition testimony and their answers to interrogatories, Dr. Grassian has expressed the opinion that Michael was a "competent individual in multiple areas of functioning, [but] he was specifically incapable of . . . grappling with the issues of having been

sexually abused" and that Stephen had "a specific disability regarding his capacity to bring forward a lawsuit regarding the sexual abuse." In addition, Dr. Grassian states that "prior to 1991, the nature of [Michael's] recall experiences was very different than it is today" but he is unable to say what Michael did and did not recall about the alleged incidents at any particular point in time.

### A. *Meaning of "Unsound Mind"*

■ Section 9–1–19 does not define "unsound mind." Nor has the Rhode Island Supreme Court had occasion to construe that term for statute of limitations tolling purposes. However, it has said that § 9–1–19 incorporates four "legal disabilit[ies]" that correspond to "the historical categories of *insanity*, imprisonment, minority or absence from the country." *Young v. Park*, 116 R.I. 568, 359 A.2d 697, 699 n. 3 (R.I.1976) (emphasis added).

In an attempt to clarify whether "repressed memory" falls within the definition of "unsound mind," this Court previously certified to the Rhode Island Supreme Court the question of whether, under § 9–1–19, "an inability to recall incidents of sexual abuse constitutes a disability that extends the time within which claims for resulting injury may be brought." [6] The Supreme Court did not Answer that question directly but it did say that whether repressed memory "qualif[ies] as a tolling feature under § 9–1–19" is a question of law. *Kelly*, 678 A.2d at 880.

In the absence of a statutory definition of "unsound mind," the Court must seek to determine what meaning the General Assembly ascribed to that term. Unfortunately, Rhode Island does not record committee reports or floor debates that would assist in ascertaining legislative intent. However, an indication of what the General Assembly meant may be gleaned from the history of § 9–1–19.

Section 9–1–19 was part of the Court and Practice Act of 1905 which includes a chapter on probate proceedings. *See* The Court and

---

6. At the time this Court certified the question, it appeared that all three plaintiffs were relying on claims of repressed memory. It was not until later that the Kellys described their "unsound

mind" claim as an inability to recognize that the alleged assaults were tortious and/or an inability to deal with them by commencing legal action.

Practice Act of 1905, ch. 13, § 253 (current version at R.I.Gen.Laws § 9–1–19). The probate chapter appears to equate "unsound mind" with an overall inability to function or manage one's own affairs. It permits the appointment of a guardian for "the person and estate of any idiot, lunatic or person of unsound mind. . . ." The Court and Practice Act of 1905, ch. 50, § 1047 (later codified at R.I.Gen.Laws § 33–15–8) (repealed July 21, 1992). The use of "unsound mind" in series with "idiot" and "lunatic" strongly suggests that the term connotes a completely incapacitating condition that renders a person legally incompetent.

The subsequent enactment of § 9–1–51 lends further support to the conclusion that the legislature intended the "unsound mind" tolling provision contained in § 9–1–19 to refer only to conditions that render a person legally incompetent or incapable of managing his or her everyday affairs. Section 9–1–51 was adopted in response to a number of childhood sexual abuse cases in which the issue of repressed memory was raised. When that section was enacted, it was well established that, for statute of limitations purposes, personal injury causes of action generally were deemed to accrue at the time of injury. *Von Villas v. Williams,* 117 R.I. 309, 366 A.2d 545, 548 (R.I.1976); *Byron v. Great Am. Indem. Co.,* 54 R.I. 405, 173 A. 546, 547 (R.I.1934). At that time, "unsound mind" also commonly was understood to refer to a condition rendering a person incompetent or unable to manage his or her everyday affairs. *See, e.g., Sosik v. Conlon,* 91 R.I. 439, 164 A.2d 696, 698 (R.I.1960) (in order to invalidate a contract on the ground that the plaintiff was mentally incapacitated or of "unsound mind," "[t]here must be such a condition of insanity or idiocy as, from its character or intensity, disables him from understanding the nature and effect of his acts, and therefore disqualifies him from transacting business and managing his property" (internal quotation omitted)).

The manifest purpose of incorporating a "discovery" rule into § 9–1–51 was to defer accrual of claims against perpetrators of childhood sexual abuse when the claimants were unable to recall the incidents of abuse. If the General Assembly had considered the "unsound mind" tolling provision to be applicable to conditions like repressed memory, there would have been little need for inserting a "discovery" provision into § 9–1–51.

In addition, it is significant that, although the General Assembly implicitly recognized that "unsound mind" connotes something different from conditions like repressed memory, it chose not to include repressed memory as one of the tolling provisions embraced by § 9–1–19 thereby manifesting an intention that "unsound mind" continue to refer only to incompetency or an inability to manage one's everyday affairs.

At the same time, the General Assembly also opted not to incorporate a discovery provision in § 9–1–14(b). By adopting a "discovery" rule in § 9–1–51 but retaining the "three years from accrual" statute of limitations contained in § 9–1–14(b), the General Assembly evinced an intent that claims governed by § 9–1–14(b) should continue to be considered as accruing at the time of injury.

Limiting "unsound mind" to conditions of incompetency or inability to manage everyday affairs also is in accord with the manner in which courts have construed that term. Although the Rhode Island Supreme Court has never defined "unsound mind" for statute of limitations tolling purposes, it has referred to the term, in other contexts, as a condition that renders an individual legally incompetent or incapable of managing his or her everyday affairs. *See, e.g., Miller v. Rhode Island Hosp.,* 625 A.2d 778, 785 (R.I.1993) (distinguishing legal competency from competency to give medical consent and describing "unsound mind" as a form of legal incompetency characterized by "[t]he inability to 'govern' one's self and manage one's other affairs" (internal quotation omitted)); *Sosik,* 164 A.2d at 698. Moreover, the overwhelming weight of authority in other jurisdictions is that this definition is equally applicable in determining whether the period of limitations has been tolled. *See, e.g., Jacobs v. The Baylor School,* 957 F.Supp. 1002, 1010 (E.D.Tenn.1996); *Prebble v. Hinson,* 825 F.Supp. 185, 188 (S.D.Ohio 1993); *Doe v. Maskell,* 342 Md. 684, 679 A.2d 1087, 1093–94

(Md.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 770, 136 L.Ed.2d 716 (1997); *Travis v. Ziter,* 681 So.2d 1348, 1355 (Ala.1996); *Florez v. Sargeant,* 185 Ariz. 521, 917 P.2d 250, 255 (Ariz.1996); *Lemmerman v. Fealk,* 449 Mich. 56, 534 N.W.2d 695, 703 (Mich.1995); *Lovelace v. Keohane,* 831 P.2d 624, 629 (Okl.1992); *O'Neal v. Division of Family Services,* 821 P.2d 1139, 1143 (Utah 1991); *McCarthy v. Volkswagen of Am., Inc.,* 55 N.Y.2d 543, 548–49, 450 N.Y.S.2d 457, 460, 435 N.E.2d 1072, 1075 (N.Y.1982); *Rigazio v. Archdiocese of Louisville,* 853 S.W.2d 295, 297 (Ky.Ct.App. 1993).

Indeed, defining "unsound mind" differently for statute of limitations purposes than for other purposes would violate the canon of statutory construction that terms be construed in accordance with their common and accepted meanings. *Gross v. Division of Taxation,* 659 A.2d 670, 671–72 (R.I.1995). It also would create the potential for inconsistencies and anomalous results. For example, an individual suffering from selective repressed memory might be considered competent to assert claims but of "unsound mind" for purposes of determining whether the statute of limitations has expired with respect to some of those claims.

 It is true that the statute of limitations sometimes may bar legitimate claims. However, there are sound policy reasons for establishing limits on the time within which claims may be asserted. Statutes of limitations are enacted to bring finality to disputes, thereby enabling the parties to conduct their affairs secure in the knowledge that the matter has been closed. *See Wood v. Carpenter,* 101 U.S. 135, 139, 11 Otto 135, 25 L.Ed. 807 (1879); *Wilkinson v. Harrington,* 104 R.I. 224, 243 A.2d 745, 751 (R.I.1968). In addition, they prevent the injustice that may result from requiring a defendant to litigate a stale or fraudulent claim raised long after relevant evidence has been destroyed, witnesses have become unavailable or memories have dimmed. *Wilkinson,* 243 A.2d at 752. In short, statutes of limitations create an incentive for parties to assert their rights in a timely fashion rather than procrastinating or delaying in order to gain a tactical advantage. These considerations outweigh the risk that meritorious claims occasionally may be foreclosed, particularly since the claimants can avoid that risk by acting with due diligence.

For all of those reasons, legislative bodies have carefully circumscribed the situations under which statutes of limitations are tolled. Generally speaking, tolling provisions that are based on an individual's capacity have been limited to conditions that render the individual legally incompetent. That is precisely the approach taken by § 9–1–19 which, as previously noted, incorporates the kinds of legal incapacities recognized at common law. *Young,* 359 A.2d at 699 n. 3.

 Because determinations regarding tolling provisions based on a plaintiff's legal capacity are considered policy decisions to be made by legislative bodies, courts construe such provisions strictly. *Kenyon v. United Elec. Ry. Co.,* 51 R.I. 90, 151 A. 5, 8 (R.I. 1930) ("[C]ourts are without power to read into statutes exceptions which have not been named therein however reasonable they may seem."). This principle is equally applicable to claims that "repressed memory" or other limited impairments are forms of "unsound mind" that toll the statute of limitations in sexual abuse cases. *See O'Neal,* 821 P.2d at 1143 ("[I]f this sort of change is to be made in the law of limitations or some narrow exception is to be crafted to deal only with sexual abuse cases, the matter should be addressed by the legislature."); *Lemmerman,* 534 N.W.2d at 703 ("The more appropriate forum for resolution of the question whether persons alleging repression of memory of past assaults should be allowed to pursue claims against their accused attackers is the legislative arena.").

In this case, acceptance of the plaintiffs' argument that the conditions they claim should be viewed as a form of "unsound mind" would amount to judicial law making and would undermine the purposes served by the statute of limitations. It would transform "unsound mind" into an amorphous concept requiring an individualized and highly subjective determination in every case as to whether a particular condition qualifies and, if so, whether and how long a particular plaintiff, in fact, suffered from that condition.

The difficulty of making that determination would be compounded by the fact that it necessarily turns on facts that no longer exist. A defendant's opportunity to gather evidence rebutting a claim regarding the plaintiff's condition, at some time in the past, would be greatly curtailed. In addition, the reliability of opinions regarding that condition would be greatly diminished inasmuch as such opinions ordinarily would be rendered by "expert witnesses" who are retained for purposes of litigation and who, probably, never examined the plaintiff when the condition allegedly existed.

In short, construing "unsound mind," for tolling purposes, as a condition that renders a plaintiff incapable of managing his or her everyday affairs reflects the intent manifested by the legislature; is consistent with the commonly accepted meaning of that term; provides a relatively reliable and objective test for determining tolling and serves the sound policies underlying the statute of limitations. On the other hand, expanding "unsound mind" to the conditions claimed by these plaintiffs would amount to judicial legislation; would lead to inconsistency and uncertainty; would open the door to stale and fraudulent claims and would create an exception that swallows the rule.

For all of these reasons, this Court concludes that the "unsound mind" tolling provision contained in § 9–1–19 refers to a mental condition that renders a person incompetent or incapable of managing his or her everyday affairs and does not encompass more limited impairments such as a selective inability to recall particular facts or a reluctance to seek legal redress based upon those facts.

B. *Application to this Case*

Having determined that the term "unsound mind" contained in § 9–1–19 refers only to a condition that renders one unable to manage his or her everyday affairs, it is clear that, even when the evidence presented by the plaintiffs is viewed in the light most favorable to them, it is insufficient to establish that they suffered from any such condition.

As already noted, during the time period Kenneth Smith claims to have been of unsound mind, he attended college, served in the National Guard, held several jobs, married and supported a family. Although he underwent counseling for a four-year period, that counseling did not begin until Smith was twenty-eight and it dealt with problems arising from the relationship between his parents. Moreover, while Smith previously received treatment for substance abuse, Dr. Plummer concluded that he never suffered from any disability that prevented him from engaging in day-to-day activities. That opinion is corroborated by the fact that Smith was never placed under guardianship or conservatorship and was never institutionalized for treatment of any psychological or substance abuse problems.

Michael Kelly's case presents similar circumstances. During the time that he claims to have been of "unsound mind," Michael worked, first, as a laborer for a construction firm, later, as a sales consultant and, eventually, as a manager at a home electronics company. As already noted, there is no indication that he ever was treated for any substance abuse problem or mental disorder or that he ever was placed under guardianship or conservatorship. Based on his review of Michael's medical records, Dr. Grassian concluded that Michael was functioning competently in multiple areas of his life.

Stephen Kelly's claim of "unsound mind" has more substance but the facts presented fall far short of establishing that he was incompetent or incapable of managing his everyday affairs. After the alleged abuse, Stephen began smoking marijuana and dropped out of college. He lived, briefly, with his parents while attending college part time and, then, worked, for several years, as a carpenter and scallop shucker. After that, he moved to California where, for the next few years, he lived, primarily, in communes and performed odd jobs in exchange for food and lodging. During part of that time, Stephen lived in Canada, where he sought counseling for depression and occasional suicidal thoughts. Stephen states that for most of the time since the alleged assaults by Fr. Marcantonio, he has frequently used marijuana and LSD. However, like the other plaintiffs, he never was institutionalized for treat-

ment of psychological or substance abuse problems and never has been placed under guardianship or conservatorship.

Clearly, Stephen has been plagued by a variety of problems with which he has had considerable difficulty coping. However, although the difficulties and the resulting depression that he has experienced should not be minimized, they did not render him of "unsound mind." *See Florez,* 917 P.2d at 256 (plaintiff is not of "unsound mind" simply because he drops out of high school, is unable to find steady employment or a steady place of residency, squanders money and suffers from depression and stress. "If these facts ... were sufficient to support a legal finding of 'unsound mind,' then all those who have less than satisfactory lives would be of 'unsound mind.' ").

Because none of the plaintiffs in these consolidated cases were of "unsound mind" within the meaning of that term, R.I.Gen. Laws § 9–1–19 does not toll the statute of limitations with respect to their claims.

## II. *Fraudulent Concealment*

### A. *The Legal Principles*

As already noted, R.I.Gen.Laws § 9–1–20 tolls the period of limitations when a defendant fraudulently conceals the existence of a cause of action against him. The statute provides:

> If any person, liable to an action by another, shall fraudulently, by actual misrepresentation, conceal from him or her the existence of the cause of action, said cause of action shall be deemed to accrue against the person so liable therefor at the time when the person entitled to sue thereon shall first discover its existence.

R.I.Gen.Laws § 9–1–20.

■ In order to establish fraudulent concealment, a plaintiff must show:

1. that the defendant [7] made an actual misrepresentation of fact; and

2. that, in making such misrepresentation, the defendant fraudulently concealed the existence of the plaintiff's cause of action.

■ Mere silence or a failure to volunteer information does not constitute an "actual misrepresentation." *Kenyon,* 151 A. at 8. What is required is "some express representation or other affirmative conduct amounting in fact to such a representation which could reasonably deceive another and induce him to rely thereon to his disadvantage." *Caianiello v. Shatkin,* 78 R.I. 471, 82 A.2d 826, 829 (R.I.1951) (dealing with equitable estoppel).

■ Moreover, the misrepresentation must mislead the plaintiff with respect to facts that are material in determining whether a cause of action exists. In this connection, a distinction must be drawn between facts sufficient to establish that a plaintiff has a claim and evidence required to prove that claim. Misrepresentations that prevent a plaintiff from learning that an actionable wrong has occurred and that the defendant may be liable may constitute fraudulent concealment. On the other hand, a defendant's mere failure to voluntarily disclose information that might be helpful in proving the plaintiff's case does not amount to fraudulent concealment. *Kenyon,* 151 A. at 8. The relevant consideration is not whether a defendant came forward with all relevant evidence bearing on its potential liability. Rather, it is whether the defendant fraudulently misrepresented material facts so as to mislead the plaintiff into believing that no cause of action existed.

■ Finally, in order to establish that a misrepresentation was "fraudulent," there must be a showing that the plaintiff justifiably relied upon that misrepresentation in concluding that no cause of action existed. *Travers v. Spidell,* 682 A.2d 471, 472–73 (R.I. 1996) (discussing the elements of fraud, albeit not in the context of § 9–1–20). There is no fraudulent concealment where the claimed reliance is patently unreasonable.

---

**7.** Fraudulent concealment tolls the statute of limitations only as to those defendants making the misrepresentations. *Renaud v. Sigma–Aldrich Corp.,* 662 A.2d 711, 714 (R.I.1995).

## B. *Application to this Case*

### 1. *Re the Hierarchy Defendants*

In this case, the plaintiffs' fraudulent concealment claims, like their other tolling claims, are very vague and difficult to fathom. Their allegations with respect to the hierarchy defendants appear to be that the hierarchy defendants knew that the priests previously had committed sexual assaults and that the hierarchy defendants not only failed to disclose that information; but, also, that they engaged in a "cover-up" by transferring the priests from the parishes to which they had been assigned without explaining the reasons for the transfers.

■ It is not clear whether these allegations refer to the hierarchy defendants' conduct before or after the alleged abuse occurred. If the plaintiffs are relying on conduct that predates the alleged assaults, their reliance is misplaced. What the hierarchy defendants knew, did or failed to do *before* the alleged abuse may be relevant to their potential liability for that abuse. However, it is irrelevant for purposes of determining whether, *after* the abuse occurred, the hierarchy defendants fraudulently concealed the existence of the plaintiffs' cause of action. *See Martinez–Sandoval v. Kirsch*, 118 N.M. 616, 884 P.2d 507, 515 (N.M.App.) (defendant's failure to tell plaintiff of priest's past sexual misconduct "may be relevant to Plaintiff's failure-to-warn claim, but [it] do[es] not concern concealment of [priest]'s misconduct toward Plaintiff herself"), *cert. denied*, 118 N.M. 731, 885 P.2d 1325 (N.M.1994), *cert. denied*, 515 U.S. 1124, 115 S.Ct. 2282, 132 L.Ed.2d 285 (1995). As the Maryland Court of Special Appeals so aptly put it in a similar case:

> [A]ppellant is alleging that, at some time *before* he was abused, the Archdiocese knowingly put the priests in a position to abuse him by concealing *prior* incidents in which the priests abused other children. This cannot support a claim that the Archdiocese concealed a cause of action from appellant; appellant does not allege that *after* the priests abused appellant, the Archdiocese committed a fraud that prevented appellant from knowing of its wrongdoing or from discovering his claims.

*Doe v. Archdiocese of Washington*, 114 Md. App. 169, 689 A.2d 634, 644–45 (Md.App. 1997).

■ On the other hand, if the plaintiffs are relying on conduct that postdates the alleged abuse, their argument fails because the allegations upon which it rests are not supported by any facts. The plaintiffs do not claim that the hierarchy defendants ever made any "actual misrepresentations" to them. Indeed, they candidly concede that they never had any communications with the hierarchy defendants. Furthermore, the plaintiffs have neither explained nor presented any evidence regarding how any transfers of Frs. O'Connell and/or Marcantonio after the alleged abuse occurred could have concealed the existence of their causes of action for that abuse.

In addition, the plaintiffs are unable to present any convincing reason for treating the hierarchy defendants' silence with respect to their alleged knowledge of the priests' prior sexual misconduct as the kind of "affirmative conduct" that would toll the period of limitations. As already noted, mere silence or a failure to volunteer information does not amount to an "actual misrepresentation" within the meaning of § 9–1–20. *Kenyon*, 151 A. at 8.

■ The plaintiffs argue that the hierarchy defendants, silence should be construed as an "actual misrepresentation" on the ground that the hierarchy defendants had a fiduciary duty to disclose their knowledge of the priests' alleged propensities. There are several flaws in that argument. First, the record is barren of any evidence regarding the existence or nature of any fiduciary relationship between the plaintiffs and the hierarchy defendants. Because the plaintiffs presumably had some unspecified affiliation with parish churches within the Diocese of Providence, they, apparently, are asking the Court to infer the existence of a fiduciary relationship between them and the hierarchy defendants sufficient to require the hierarchy defendants to disclose what they previously may have known about the priests' propensi-

ties. The Court declines the invitation to engage in such speculation.

▪▪▪ Even if it is assumed *arguendo* that such a fiduciary obligation existed, it would not require disclosures of that nature to be made *after* the alleged abuse occurred. The duty owed by the hierarchy defendants to the plaintiffs, whether fiduciary or otherwise, was to take reasonable steps to prevent the alleged abuse. The suggestion that this duty encompassed an obligation, after the fact, to disclose prior sexual misconduct by the priests as opposed to taking appropriate action, before the fact, to prevent its recurrence, raises serious First Amendment concerns. *See Smith,* 986 F.Supp. at 80–81. In any event, to the extent that there was a duty to disclose, it did not include an obligation, *after* the alleged abuse occurred, to volunteer information tantamount to an admission of liability for the abuse. To so hold would be to stretch the notion of fiduciary responsibility beyond all recognized limits.

▪▪▪ Finally, neither the alleged failure to disclose nor the alleged transfers concealed from the plaintiffs the "existence of [their] cause of action." R.I.Gen.Laws § 9–1–20. There is no evidence that the hierarchy defendants misled the plaintiffs into believing that the assaults had not occurred, that they had not been committed by the defendant priests or that they had not resulted in injury to the plaintiffs.

▪▪▪ The plaintiffs appear to suggest that, although the alleged nondisclosure may not have concealed the existence of their cause of action against the priests, it did conceal the existence of their cause of action against the hierarchy defendants. The premise upon which that suggestion implicitly rests is that a cause of action does not arise until all relevant evidence bearing on a defendant's potential liability is known. The plaintiffs have cited no authority to support that proposition. On the contrary, under Rhode Island law, it is well established that, except in cases where the "discovery" rule applies, a personal injury cause of action accrues at the time of injury. *Von Villas,* 366 A.2d at 548; *Byron,* 173 A. at 547. Accrual or the existence of a cause of action is not deferred until a plaintiff learns of all the facts that may be helpful in proving his or her claim. *Arnold v. R.J. Reynolds Tobacco Co.,* 956 F.Supp. 110, 117 (D.R.I.1997) ("For [a cause of] action to accrue, a plaintiff does not need to be aware of all the facts supporting the claim."); *Benner v. J.H. Lynch & Sons, Inc.,* 641 A.2d 332, 337–38 (R.I.1994); *Astle v. Card,* 52 R.I. 357, 161 A. 126, 128 (R.I.1932). Once it becomes apparent that a cause of action exists, the statute of limitations begins to run even though the plaintiff's investigation is not complete. *Arnold,* 956 F.Supp. at 117; *Benner,* 641 A.2d at 338. It becomes the plaintiff's responsibility, through the discovery process or otherwise, to undertake whatever further investigation may be appropriate in order to gather specific bits of evidence supporting the claim. *Arnold,* 956 F.Supp. at 117.

Here, at the time the alleged abuse occurred, the plaintiffs were well aware that the hierarchy defendants, as the priests' "employers," were potentially liable for that abuse. *See Doe,* 689 A.2d at 645 (a plaintiff who is sexually assaulted by a priest is on inquiry notice of his potential claims against the Archdiocese, as the priest's employer). There is no indication that the hierarchy defendants made any effort to misrepresent the nature of their relationship to Frs. O'Connell and Marcantonio. Consequently, it cannot be said that the hierarchy defendants fraudulently concealed the plaintiffs' causes of action against them.

### 2. *Re Fr. Marcantonio*

▪▪▪ The contention that Fr. Marcantonio fraudulently concealed the existence of the Kellys' cause of action against him is based on the allegations that Fr. Marcantonio told them that his advances were part of their religious training in sexuality. Clearly, any such statements would have been both false and despicable. However, they do not amount to fraudulent concealment of the plaintiffs' causes of action against Fr. Marcantonio because the Kellys' alleged reliance on those statements would have been unreasonable as a matter of law.

It might be reasonable for a minor, of tender years, to believe such patently spe-

cious statements. However, it would be manifestly unreasonable· for an otherwise competent adult to continue believing them. *See Doe v. United Methodist Church,* 673 N.E.2d 839, 844–45 (Ind.Ct.App.1996) (continued reliance by plaintiff upon statements made by defendant that sexual activity was "a part of the accepted counseling process" is unreasonable as a matter of law); *E.J.M. v. Archdiocese of Philadelphia,* 424 Pa.Super. 449, 622 A.2d 1388, 1395 (Pa.Super.1993) (where abuse continued for years and ended when appellant was twenty years old, "[i]t is beyond comprehension that appellant would not or should not have questioned whether his relationship with [the priest] was truly aimed solely at appellant's preparation for the priesthood").

Since the period of limitations applicable to the Kellys' claims is three years; and, since both of the Kellys reached the age of majority more than three years before commencing this action, their claims against Fr. Marcantonio are time barred even if he made the statements attributed to him.

## III. *Other Tolling Theories*

The plaintiffs mention a variety of other theories that sometimes have been recognized as grounds for tolling the statute of limitations. However, they do little more than "mention" those theories. The plaintiffs make no effort to explain the theories or how they might apply in this case. In the absence of any supporting facts, arguments or authorities, those theories are summarily rejected.

■ The only theory that the plaintiffs have made any attempt to develop is that the hierarchy defendants conspired to cover up the priests' past sexual misconduct and their knowledge of it and that the conspiracy continued until less than three years before these actions were commenced. To the extent that the plaintiffs are suggesting that the alleged conspiracy constituted fraudulent concealment that tolled the statute of limitations, it is nothing more than a rehash of the argument previously made and rejected. *See supra* Part II. To the extent that the plaintiffs are contending that the alleged conspiracy gave rise to an independent cause of action on which the period of limitations did not begin to run until the conspiracy terminated, their argument fails for several reasons.

■ First, the plaintiffs have not even alleged, let alone presented sufficient facts to establish, the existence of a conspiracy. Proof of a conspiracy requires proof that: (1) there was an agreement between two or more parties and (2) the purpose of the agreement was to accomplish an unlawful objective or to accomplish a lawful objective by unlawful means. *Stubbs v. Taft,* 88 R.I. 462, 149 A.2d 706, 708–09 (R.I.1959). Although Count VI of the complaint is entitled "Conspiracy to Commit Acts and Violate Plaintiffs' Rights," the complaint is devoid of any specific allegations regarding the existence of such an agreement. Nor have the plaintiffs presented any facts from which the existence of such an agreement reasonably could be inferred.

Moreover, the plaintiffs rely on R.I.Gen. Laws § 9–1–2 which provides that "[w]henever any person shall suffer any injury to his or her person ... *by reason of* the commission of any crime or offense, he or she may recover his or her damages for such injury in a civil action against the offender ...." (emphasis added). That statute requires a causal connection between the alleged crime and the claimed injury; but, here, the plaintiffs have not identified any such nexus. On the contrary, it is clear that the injuries for which the plaintiffs seek to recover flow from the alleged assaults by the priests and not from any concerted action by the hierarchy defendants, after the assaults occurred, to conceal facts bearing on their potential liability.

### *Conclusion*

For all the forgoing reasons, the motions for summary judgment by the hierarchy defendants and Fr. Marcantonio are granted. IT IS SO ORDERED.